ATTORNEYS FOR APPELLANT
Susan K. Carpenter
Public Defender of Indiana

P. Jeffrey Schlesinger
Deputy Public Defender
Crown Point, IN

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Kelly A. Miklos
Deputy Attorney General
Indianapolis, Indiana

_____

### In the
### Indiana Supreme Court

FILED

Jun 26 2008, 11:55 am

CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 45S00-0608-CR-298

DARRYL JETER,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

Appeal from the Lake Superior Court, No. 45G04-0312-MR-00010
The Honorable Thomas Stefaniak, Jr., Judge

_____

**June 26, 2008**

**Rucker, Justice.**

A jury found Darryl Jeter guilty of murder in the shooting death of Indiana State Trooper Scott Patrick. He was also found guilty of auto theft, a Class D felony. Upon the jury's recommendation of life without parole the trial court sentenced Jeter accordingly. The trial court also sentenced him to three years for the auto theft conviction to be served consecutively. In this

direct appeal Jeter raises three issues, which we recast as four and rephrase as follows: (1) did the trial court err in concluding that Jeter's attempt to peremptorily challenge a prospective juror violated Batson v. Kentucky, 476 U.S. 79 (1986); (2) did the trial court abuse its discretion by replacing a seated juror with an alternate; (3) was an eyewitness's in-court identification of Jeter unduly suggestive; and (4) did the trial court err in the admission of certain testimony. We affirm.

**Facts**

In the early morning hours of December 22, 2003 Darryl Jeter was driving a stolen car along Interstate 80/94 in Gary, Indiana. The car was missing a front tire. En route to visit his girlfriend, Ms. Young, Jeter was on parole from the state of Illinois and was not permitted to travel outside of that jurisdiction without prior permission from his parole officer. Seeing the car and the sparks that were coming from the missing front tire, a motorist called the Indiana State Police. Jeter exited 80/94 onto the Grant Street exit ramp, which was near the house where he planned to visit his girlfriend. The car ended up stuck in a grassy area off the side of the ramp. Walking along the exit, Jeter called Young at approximately 4:15 a.m., told her he had a flat tire, that he would grab his compact discs, and he would get another car and be on his way.

In the meantime, responding to a dispatch of a vehicle in distress, Indiana State Trooper Scott Patrick arrived on the scene. The record is silent as to what occurred immediately thereafter. In any event, following is the summarized testimony of Karl Dickel, an over-the-road truck driver. Pulling his rig onto the Grant Street exit, Dickel saw a state patrol car with its emergency lights flashing and observed two people struggling and wrestling with one another at the rear of the car. The two were later identified as Jeter and Trooper Patrick. As they broke apart, Jeter faced Dickel's truck and Dickel turned on his high beam headlights in order to aid the trooper by blinding Jeter. According to Dickel he saw part of Jeter's face and profile. Jeter then walked around the right front hood of the police car and pulling a handgun fired twice at Trooper Patrick, who was on the other side of the car also near the hood. According to Dickel, although the trooper appeared to have been hit, he nonetheless returned fire, striking Jeter. After

2

exchanging additional gunfire Jeter ran from the immediate area. He dropped his handgun and compact discs along the way. Trooper Patrick lay bleeding on the ground.

Immediately thereafter State Trooper Geoffrey Gruber arrived on the scene and began assisting Trooper Patrick. As he did so, Dickel saw Jeter returning to the area and alerted Trooper Gruber, "That is the guy that shot him." Tr. at 197. Jeter climbed into the cab of a truck that was parked nearby and appeared to be attempting to drive away. Trooper Gruber removed Jeter from the truck and placed him in handcuffs.

Paramedics arrived on the scene. Both Jeter and Trooper Patrick were transported to an area hospital. Trooper Patrick died as a result of a gunshot wound to the neck. While at the hospital being treated for a gunshot wound to his shoulder, Jeter told the emergency room nurse to "[t]ell the officer he was sorry, he didn't mean to shoot him . . . . But [he] just didn't want to go back to jail." Tr. at 895. Informed that would be difficult to do because the officer was dead, Jeter "sprang up from a reclining position and said, 'He's dead? He's dead?'" to which the nurse responded affirmatively. Tr. at 892.

**Background**

The State charged Jeter with murder and auto theft as a Class D felony. Based on the aggravating circumstance that the victim was a law enforcement officer acting in the course of duty, the State sought the death penalty. Ind. Code § 35-50-2-9(b)(6)(A).

Prior to trial Jeter, who is African American, filed a motion to dismiss the death penalty. In his supporting brief and again at a pre-trial evidentiary hearing, Jeter attempted to demonstrate that "As applied in the real world, actual capital jurors are not making sentencing decisions consistent with state and federal constitutional mandates." App. at 346. Among other things Jeter contended that racism was so inherent in the jury selection process that especially in the case of a black defendant and a white victim, a black defendant has the greatest risk of receiving a death sentence when white males serve on the jury. App. at 310, 407, 429, 432-33; Hearing Tr. 02/24/2006 at 97-111, 190, 192-96. The trial court denied the motion.

Jury selection began May 1, 2006. Of his first nine peremptory challenges Jeter used six to exclude white males and three to exclude white females. On at least three occasions the State objected on grounds that the jurors were being excluded on the basis of race and perhaps gender. The trial court overruled the objections. When Jeter attempted to use his tenth peremptory challenge to exclude juror number 212, a nineteen-year-old white male, the State again objected. Recounting Jeter's use of his first nine peremptory strikes the trial court said, "There is a clear pattern developed that the defense is striking Caucasians from this jury. There is no question in my mind." Voir Dire Tr. at 1874. After an extended dialogue, the trial court directed Jeter to give a race-neutral reason for the strike. Jeter responded: (1) the juror's father was a police officer; (2) his grandfather had been a local attorney and judge of a municipal court; and (3) the juror responded "I guess not" when asked if he could think of any murders that were not suitable for the death penalty. Voir Dire Tr. at 1886-87. Reasoning that Jeter's proffered explanation was "pretextual," the trial court disallowed the peremptory challenge and juror number 212 was seated. Voir Dire Tr. at 1911-12.

Jury selection continued and, responding to the State's claim of another instance of Jeter's improper use of a peremptory challenge, juror number 257 was seated as the last regular juror. At some point the trial court noted that seating juror number 257 was in error and that he should have been removed for cause in that his jury questionnaire revealed that he was a defendant in a pending criminal case.[1] The juror was thus removed and over Jeter's objection the trial court replaced the juror with the first seated alternate.[2]

During trial the State called Karl Dickel, whose testimony is summarized in the Facts section of this opinion. When asked to point Jeter out in court, the defense objected on grounds that the identification was unduly suggestive. The trial court overruled the objection, and Dickel identified Jeter as the person he observed firing a handgun at Trooper Patrick in the early morning hours of December 22, 2003.

---

[1] "In criminal cases the court shall sustain a challenge for cause if the prospective juror: . . . is a defendant in a pending criminal case." Ind. Jury Rule 17(b)(2).

[2] Not including the alternates, the resulting jury consisted of two white males, two white females, two Hispanic males, two Hispanic females, three black females, and one black male.

4

The State also called Jeter's girlfriend, Ms. Young. Among other things Young testified that while in custody pending trial, Jeter sent her a number of letters. One letter, introduced into evidence as State's Exhibit 331, directed Young to contact an apparent defense investigator and tell her, "I wasn't driving that car and that someone was dropping me off at your house . . . ." When asked "What did that mean to you?" Jeter objected on relevancy grounds and that it called for speculation. Tr. at 2659. The trial court overruled the objection, and Young testified that it meant Jeter wanted her "[t]o lie for him." Id.

The jury found Jeter guilty as charged. At the penalty phase of trial, the jury rejected the State's argument for the death penalty and instead recommended that Jeter be sentenced to life in prison without parole. At sentencing, the trial court accepted the jury's recommendation and sentenced Jeter accordingly. The trial court also imposed a three-year consecutive sentence for the auto theft conviction. This direct appeal followed. Additional facts are recited below where necessary.

**Discussion**

**I**.

*The <u>Batson</u> Challenge*

Jeter contends the trial court erred in denying his use of a peremptory challenge to strike juror number 212.[3] More specifically Jeter argues that his alleged "pattern" of striking whites from the jury was the inevitable consequence of the composition of the jury pool itself. According to Jeter, "76 percent of the individuals who appeared for jury service were white [and therefore] Darryl was statistically more likely to use peremptory strikes against white individuals." Br. of Appellant at 17. Jeter also argues that his explanations for striking the juror were properly based on reasons other than race.

In <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), <u>modified by</u> <u>Powers v. Ohio</u>, 499 U.S. 400, 405-06 (1991) (applying <u>Batson</u> where the defendant and the excluded juror were of different

---

[3] Jeter also complains the trial court erred in denying his use of a peremptory challenge to strike juror number 257. Br. of Appellant at 19-20. However, as indicated <u>supra</u>, this juror was later removed for cause. Any error is thus harmless.

5

races), the United States Supreme Court determined that the prosecutor's use of a peremptory challenge to strike a potential juror solely on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment. The Court has extended the reach of Batson to include criminal defendants as well. "We hold that the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges." Georgia v. McCollum, 505 U.S. 42, 59 (1992).

The Batson Court developed a three-step test to determine whether a peremptory challenge has been used improperly to disqualify a potential juror on the basis of race. First, the party contesting the peremptory challenge must make a prima facie showing of discrimination on the basis of race. Batson, 476 U.S. at 96. Second, after the contesting party makes a prima facie showing of discrimination, the burden shifts to the party exercising its peremptory challenge to present a race-neutral explanation for using the challenge. Id. at 97. Third, if a race-neutral explanation is proffered, the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination. Id. at 98.

Much of Jeter's Batson argument focuses on whether the trial court erroneously determined that his peremptory challenges demonstrated a pattern of striking whites on the basis of race. Pointing out, for example, that the composition of the venire made it more likely that whites would be struck disproportionately, Jeter contends the evidence is clear there was no impermissible pattern. He also suggests that striking white jurors was part of a trial strategy of ensuring a more racially diverse jury. "Because a young black man was charged with shooting and killing a white police officer, the racial makeup of the jury was extremely important in this case." Br. of Appellant at 13.

We make two observations. First, as for his latter claim, Jeter advances an argument that found no traction in McCollum. Writing in dissent Justice O'Connor observed, "Using peremptory challenges to secure minority representation on the jury may help to overcome . . . racial bias, for there is substantial reason to believe that the distorting influence of race is minimized on a racially mixed jury." McCollum, 505 U.S. at 68 (O'Connor, J., dissenting). In partial support for this view Justice O'Connor quoted the Brief of Amicus in that case:

6

> The ability to use peremptory challenges to exclude majority race jurors may be crucial to empaneling a fair jury. In many cases an African American, or other minority defendant, may be faced with a jury array in which his racial group is underrepresented to some degree, but not sufficiently to permit challenge under the Fourteenth Amendment. The only possible chance the defendant may have of having any minority jurors on the jury that actually tries him will be if he uses his peremptories to strike members of the majority race.

Id. at 69 (quoting Brief for NAACP Legal Defense and Educational Fund, Inc., as *Amicus Curiae* at 9-10). The majority did not directly respond to this dissenting view. Instead the Court stated more broadly, "It is an affront to justice to argue that a fair trial includes the right to discriminate against a group of citizens based upon their race." McCollum, 505 U.S. at 57. In essence, although the argument Jeter makes is not without some force, it is not consistent with Batson and its progeny.

Second, Jeter's claim of trial court error in finding a pattern of striking white potential jurors is no longer relevant.[4] The import of the trial court's finding was a determination that the State made a prima facie showing of discrimination based on race – the first Batson step. However, once the proponent "has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [opponent of the challenge] had made a prima facie showing becomes moot." Hernandez v. New York, 500 U.S. 352, 359 (1991). Applying this rule here we thus turn to the second Batson step.

We acknowledge that Jeter's proffered reasons for striking juror number 212 were race-neutral as a matter of law. "The second step of this process does not demand an explanation that is persuasive, or even plausible. At this [second] step of the inquiry, the issue is the facial

---

[4] Even if we were to credit Jeter's claim that the composition of the venire made it more likely that whites would be struck disproportionately, this claim nonetheless misses the mark. It is the striking of jurors because of race, not numerical representation in the pool, that runs afoul of Batson. See Holland v. Illinois, 493 U.S. 474, 480 (1990) (Rejecting a claim that all cognizable racial groups need to be included in a jury, the Court declared, "The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does).").

validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (per curiam) (internal quotations omitted).

As mentioned earlier Jeter offered three reasons for exercising his peremptory challenge: (1) the juror's father was a police officer; (2) his grandfather had been a local attorney and judge of a municipal court; and (3) the juror responded "I guess not" when asked if he could think of any murders that were not suitable for the death penalty. These are all legitimate race-neutral reasons for exercising a peremptory strike. However, a Batson challenge does not end with the proffer of a race-neutral reason:

> If any facially neutral reason sufficed to answer a Batson challenge, then Batson would not amount to much more than Swain [v. Alabama, 380 U.S. 202 (1965) (defining the limits of relief from racially biased jury selection and requiring a showing of a continuity of discrimination over time.)]. Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand. Hence Batson's explanation that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination.

Miller-El v. Dretke, 545 U.S. 231, 240 (2005). In sum Jeter's proffered race-neutral reason not withstanding, the trial court was not bound to accept it.

Thus we turn to Batson's third step. Although the ultimate burden of persuasion regarding purposeful discrimination rests with the party opposing the strike, "This final step involves evaluating 'the persuasiveness of the justification' proffered by the [proponent of the strike] . . . ." Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting Purkett, 514 U.S. at 768). This point was amplified in Hernandez. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the [proponent's] state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" Hernandez, 500 U.S. at 365 (citations omitted).

8

In this case the trial court did not believe that Jeter's stated explanation for challenging juror number 212 was the real motivation behind the challenge. At the time Jeter moved to strike the juror, he had previously used his first nine peremptory challenges to exclude whites from the jury, especially white males. As a consequence, of the ten seated jurors, none were white males. Too, Jeter's pre-trial motion to dismiss the death penalty was premised on the argument that white male jurors would be detrimental to Jeter receiving a fair trial. Under these circumstances it was not unreasonable, and by extension certainly not clearly erroneous, for the trial court to conclude that as part of his trial strategy Jeter was intentionally discriminating against jurors, including juror number 212, on the basis of race. On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. Snyder v. Louisiana, 552 U.S. ___, 128 S.Ct. 1203, 1207 (2008). Accordingly we sustain the trial court's ruling on this issue.

## II.

*Replacing a Regular Juror With an Alternate*

Next Jeter contends the trial court abused its discretion by replacing juror number 257 with an alternate juror. Jeter's contention is based on the following additional facts. By the time the trial court discovered that juror number 257 should not have been seated in the first place and thus was removed for cause, twelve regular jurors and one alternate juror already had been selected. Although Jeter had exhausted his two peremptory challenges allocated for alternate jurors, see Ind. J.R. 18(c)(1), he had nine peremptory challenges remaining for regular jurors. As a consequence, Jeter was unable to peremptorily challenge the alternate juror who replaced juror number 257 or the three additional alternate jurors that were also selected. Jeter argues that rather than seating the alternate, the trial court should have considered the position held by juror 257 as a vacant regular juror and proceeded with jury selection from the remaining venire. This would have allowed Jeter the use of his nine remaining peremptory challenges.

Jeter cites no authority to support his argument and our own research reveals none. To the contrary, "A defendant is entitled as a matter of right only to an impartial jury, Ind. Const. Art. I, § XIII, and not to one of his precise choosing where the issue is merely replacing a regular juror with an alternate." Jervis v. State, 679 N.E.2d 875, 882 (Ind. 1997). Indeed, Indiana Trial

9

Rule 47(B) allows alternate jurors to replace regular jurors "who, prior to the time the jury returns its verdict, become or are found to be unable or disqualified to perform their duties." Trial courts have significant leeway in determining whether to replace a juror with an alternate, and we will reverse only if there was an abuse of discretion.  Harris v. State, 659 N.E.2d 522, 525 (Ind. 1995); Ferry v. State, 453 N.E.2d 207, 213 (Ind. 1983).  Here, the trial court replaced juror number 257 with an alternate because the juror was disqualified to serve and thus removed for cause.  The trial court did not abuse its discretion in so doing.

**III**.

*Permissibility of In-Court Identification*

Jeter complains the trial court erred in permitting Dickel's in-court identification. According to Jeter the identification was impermissibly suggestive because: (1) Dickel never made a previous identification in the nearly two and a half years since the shooting and (2) Jeter was the only black person seated at the counsel table with three attorneys.

There is a degree of suggestiveness which is inherent in all in-court identifications; the practical necessity of having the appellant sit at the defendant's table with defense counsel naturally sets him apart from everyone else in the courtroom.  Emerson v. State, 724 N.E.2d 605, 609 (Ind. 2000); Griffin v. State, 493 N.E.2d 439, 442 (Ind. 1986).  Whether a particular identification procedure rises to a level of suggestiveness that constitutes reversible error must be determined from the context of the case.  Griffin, 493 N.E.2d at 442.  Suggestiveness is proscribed only when it can reasonably be avoided under the circumstances.  Id.  And absent any extraordinary effort to single out the defendant at trial, in-court identification is not unduly suggestive where the witness is firm in his identification.  Id.

Because of a criminal defendant's right to be present and confront his accusers, some amount of suggestiveness in this case could not be avoided.  There was no extraordinary effort made to single out Jeter at trial, and Dickel expressed no doubt as to the identity of the person whom he saw firing a weapon at Trooper Patrick.  Tr. at 218-19.  Further, that Dickel made no previous identification of Jeter in the two plus years since the shooting and yet was able to

identify him at trial was a matter of weight and credibility for the jury to consider. See generally Harris v. State, 619 N.E.2d 577 (Ind. 1993). An in-court identification does not become invalid merely because an extended period of time passes between the time of the crime and the initial identification. Emerson, 724 N.E.2d at 609.

In addition, Dickel's identification testimony was not the only evidence linking Jeter to the shooting of Trooper Patrick. Among other things fibers from the trooper's clothing were found on Jeter's clothing, and Jeter's fingerprints were found on the trooper's patrol car. This supported the conclusion that Jeter was the person Dickel observed wrestling and struggling with Trooper Patrick before the shooting. Too, Jeter's comment to a treating nurse that he "didn't mean to hurt [the trooper] . . . . But [he] didn't want to go back to jail," Tr. at 895, also supports the conclusion that Jeter fatally wounded the trooper. Because Dickel's in-court identification was not unduly suggestive and other evidence linked Jeter to the shooting, the trial court did not err by permitting Dickel to identify Jeter at trial.

## IV.
*Admissibility of Testimony*

Jeter last asserts the trial court erred in allowing Ms. Young to testify over his objection that she had received a letter from Jeter that in her opinion asked her to lie for him. According to Jeter the trial court "should have excluded the evidence under Rule 403 of the Indiana Rules of Evidence . . . ."[5] Br. of Appellant at 23. Assuming for the sake of discussion that on the ground asserted the trial court erred in allowing the testimony, Jeter nonetheless cannot prevail on this issue. On review of a claim challenging the admissibility of evidence, "this Court will uphold a correct legal ruling even where based on incorrect, or absent, legal reasoning below." Reaves v. State, 586 N.E.2d 847, 857 (Ind. 1992).

In this case part of Jeter's defense at trial was to lay the blame for Trooper Patrick's shooting on a supposed third party that allegedly accompanied him in the early morning hours of

---

[5] The rule provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Ind. Evidence Rule 403.

11

December 22, 2003. <u>See</u> Tr. at 42-43 (opening statements by State that Jeter told three different people that someone else was with him); Tr. at 224-25 (questioning Dickel on whether he saw another car at the scene); Tr. at 2671 (questioning Young on whether another person was in the car with Jeter earlier that day); Tr. at 2699-2700 (questioning Jeter's friend Samuella Bell on how she could know whether someone else was in the car with him).  To refute this claim, the State called as a witness another friend of Jeter, Morriel McClure.  McClure testified that he received a telephone call from Jeter who asked him to "come to court and testify . . . . [t]hat I was at the scene of the crime. . . . And that there was someone else present."  Tr. at 2635.  After several foundation questions McClure testified without objection that Jeter "was asking me to testify to being somewhere that I wasn't," Tr. at 2636, and also without objection testified "Yes" to the question of whether Jeter "ask[ed] you to lie for him."  Tr. at 2637.  In sum the testimony to which Jeter objected was cumulative of the testimony provided by McClure.  "Evidence that is merely cumulative is not grounds for reversal."  <u>Tobar v. State</u>, 740 N.E.2d 106, 108 (Ind. 2000).  As such, the trial court did not abuse its discretion by allowing the testimony.

## Conclusion

We affirm the judgment of the trial court.

Shepard, C.J., and Dickson, Sullivan, and Boehm, JJ., concur.