**Jerrme CARTWRIGHT, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 82A01–1005–CR–214.**

Court of Appeals of Indiana.

June 22, 2011.

Transfer Granted Sept. 16, 2011.

Matthew J. McGovern, Evansville, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Gary R. Rom, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

KIRSCH, Judge.

Jerrme Cartwright ("Cartwright") was convicted after a jury trial of two counts of attempted battery with a deadly weapon,[1] each as a Class C felony, two counts of attempted aggravated battery,[2] each as a Class B felony, and one count of possession of a handgun by a serious violent felon,[3] a Class B felony, and was given an aggregate sentence of twenty-six years executed. He appeals, raising the following restated issues for our review:

I. Whether the trial court erred in denying Cartwright's objection to the State's use of a peremptory challenge to strike the only Afri-

can–American from the jury venire; and

II. Whether sufficient evidence was presented to support Cartwright's convictions for attempted battery with a deadly weapon.

We reverse and remand for a new trial.

## FACTS AND PROCEDURAL HISTORY

At around 11:00 p.m. on December 27, 2008, Tiffany Boyd ("Tiffany"),[4] her husband, Jamar Boyd ("Jamar"), Michael Lockridge ("Michael"), Marcus Lockridge ("Marcus"), and a man known as Lojo went to the American Legion in Evansville, Indiana. Shaudarekkia Beattie ("Shaudarekkia") and her sister, Linda Beattie ("Linda"), arrived at the American Legion soon after. Once inside the bar at the American Legion, Jamar and Michael spoke with Cartwright, and there did not seem to be any animosity between the men. Later, however, a fight broke out on the dance floor involving Cartwright, Michael, and Marcus. After the fight began, Tiffany was struck in the back with a chair and exited through a back door. She did not know where Jamar was, so she walked around the building and found him bleeding from a wound on the side of his head. Tiffany and Jamar got into their vehicle and drove to Linda's house, which was just around the corner from the American Legion. Shaudarekkia and Linda were only present at the American Legion for ten minutes when the fight began. They also left and drove to Linda's house.

When Tiffany and Jamar arrived at Linda's house, they parked in front, and Tiffany tried to stop Jamar's head from bleed-

---

1. *See* Ind.Code §§ 35–42–2–1(a)(3), 35–41–5–1.

2. *See* Ind.Code §§ 35–42–2–1.5, 35–41–5–1.

3. *See* Ind.Code § 35–47–4–5(c).

4. At the time of the offense, Tiffany Boyd was not yet married, and her name was Tiffany Grisby. *Tr.* at 300.

ing while he sat in the passenger seat. Shaudarekkia and Linda also arrived at Linda's house, and Shaudarekkia stayed in the vehicle while Linda went inside the house. Tiffany was outside of her vehicle, and a crowd had gathered to see Jamar's head. She observed Cartwright, who was wearing a button-down shirt over a white tank top, and another man walking down the street toward her. At first, Cartwright had his hand behind his back, but then Tiffany noticed that he had a handgun in his hand. She shouted, "he got a gun [sic]," and Cartwright pointed the gun toward the crowd where Tiffany was standing and began shooting. *Tr.* at 312. When he fired into the crowd, he was between five and ten yards from the crowd. Shaudarekkia, who was still in her vehicle, attempted to hit Cartwright with her vehicle. Tiffany observed Cartwright point and shoot at Shaudarekkia. Shaudarekkia saw Cartwright with the gun and thought her vehicle may have been struck with a bullet. She also observed Cartwright fire some shots into the air.

The police had responded to the American Legion for the earlier fight and drove around the area to make sure the fight had not spilled out to the surrounding neighborhood. When the police drove down the street that ran in front of Linda's house, they saw Cartwright firing a gun into the crowd and ordered him to drop the gun. Cartwright turned, pointed the gun at the two officers, and fired shots at them. He then fled the scene and ran in the direction of a local community center. Cartwright was later apprehended in the area, but was no longer wearing his button-down shirt.

A shirt, which was later determined to have a DNA profile consistent with that of Cartwright, and a nine millimeter handgun, which was later determined to have fired the earlier shots, were found near the community center.

The State charged Cartwright with four counts of attempted murder, each as a Class A felony, two counts of unlawful possession of a firearm by a serious violent felon, each as a Class B felony, two counts of robbery, each as a Class B felony, one count of burglary as a Class A felony, two counts of criminal confinement, each as a Class B felony, one count of battery as a Class C felony, one count of pointing a firearm as a Class D felony, and one count of auto theft as a Class D felony. On March 10, 2010, a three-day jury trial began on the four counts of attempted murder and one count of unlawful possession of a firearm by a serious violent felon.[5] At the conclusion of the trial, Cartwright was found guilty of two counts of attempted battery with a deadly weapon, each as a Class C felony, which were lesser included offenses of attempted murder. He was also found guilty of two counts of attempted aggravated battery, each as a Class B felony, which were also lesser included offenses off attempted murder. He was additionally convicted of Class B felony unlawful possession of a firearm by a serious violent felon. The trial court sentenced Cartwright to an aggregate twenty-six year sentence.[6] Cartwright now appeals.

## DISCUSSION AND DECISION

### I. *Batson*[7] Challenge

Cartwright, an African–American, contends that the State exercised its peremp-

---

5. The trial was bifurcated. The first phase of the trial dealt with the four counts of attempted murder, and the second phase dealt with the unlawful possession of a firearm by a serious violent felon.

6. The State dismissed the remaining counts at the sentencing hearing.

7. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

tory challenge to remove the only African–American from the jury venire in violation of his rights to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution. "The use of a peremptory challenge to strike a potential juror solely on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution." *Killebrew v. State,* 925 N.E.2d 399, 401 (Ind.Ct.App.2010) (citing *Jeter v. State,* 888 N.E.2d 1257, 1262 (Ind. 2008), *cert. denied* —— U.S. ——, 129 S.Ct. 645, 172 L.Ed.2d 626), *trans. denied.* On appeal, a trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference and will be set aside only if found to be clearly erroneous. *Id.* When a party raises a *Batson* challenge, the trial court must undertake a three-step test. *Jeter,* 888 N.E.2d at 1263. First, it must determine whether the party making the *Batson* objection has made a *prima facie* showing that a peremptory challenge was exercised on the basis of race. *Id.* Second, after the contesting party makes a *prima facie* showing of discrimination, the burden shifts to the party exercising its peremptory challenge to present a race-neutral explanation for striking the juror. *Id.* Third, if a race-neutral explanation is proffered, the trial court must then determine if the challenger has carried its burden of proving purposeful discrimination. *Id.*

▮ Cartwright first argues that the trial court erred when it ruled that there was no *prima facie* showing of discrimination based on race. The State agrees. Here, during *voir dire,* the State used a peremptory challenge to strike the only African–American person from the jury panel. The removal of some African–American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination. *Highler*

*v. State,* 854 N.E.2d 823, 827 (Ind.2006). However, the removal of the only African–American juror that could have served raises the inference that the juror was excluded on the basis of race. *McCormick v. State,* 803 N.E.2d 1108, 1111 (Ind.2004). Therefore, when the State used a peremptory challenge to remove the only African–American person on the jury panel, it is clear that Cartwright made a *prima facie* showing of discrimination. Nonetheless, where, as here, a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing of purposeful discrimination becomes moot. *Id.*

▮ Cartwright further contends that the State's justifications for its peremptory strike of the only African–American from the jury panel were baseless and pretextual because the State failed to inquire further into such reasons and develop a sufficient record to support the reasons as race-neutral.

▮ A neutral explanation means an explanation based on something other than the race of the juror. *Id.* In the present case, the State gave the following reasons for striking the juror at issue: (1) health issues; (2) trouble listening; (3) not wanting to serve on jury; and (4) fact that a family member had a conviction for conversion. *Tr.* at 140. Each of these reasons was a permissible race-neutral explanation for the exercise of a peremptory challenge. " 'The second step of this process does not demand an explanation that is persuasive, or even plausible.' " *Jeter,* 888 N.E.2d at 1264 (quoting *Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)). At this second step of the inquiry, the issue is simply the facial validity of the prosecu-

tor's explanation. *Id.* "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Id.* (quoting *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769).

We thus turn to the third step of *Batson.* The issue here is whether Cartwright established that those facially neutral reasons were merely pretextual and a mask for purposeful discrimination. "Although the ultimate burden of persuasion regarding purposeful discrimination rests with the party opposing the strike, [t]his final step involves evaluating the persuasiveness of the justification proffered by the [proponent of the strike]...." *Id.* (internal quotations omitted).

As to the health issues, the prospective juror stated that he takes a medication that requires him to go to the bathroom frequently. *Tr.* at 127. The State asked him if the medication would cause the juror any problems with concentrating or listening, to which he responded no. *Id.* The juror never testified that his health issues would pose any problem with jury service, and on his juror questionnaire, the juror stated that he had no medical problems that would prevent his service on the jury. The record did not indicate that the juror had a health problem that would prevent him from serving on the jury.

As to the juror's trouble listening and desire not to serve on the jury, the juror stated that if he had a choice, he would rather not serve on the jury and that he was not a good listener. *Id.* at 126–27. In response to the juror's desire not to serve on the jury, the State reminded the juror that he did not "get to make that choice." *Id.* at 126. Additionally, several other potential jurors who were not African–American, expressed the same desire not to serve on the jury. Regarding his bad listening, the State asked if the juror would try to listen to the evidence present-

ed in the case, to which the juror responded yes. *Id.* at 127. Further, the juror testified that he would vote guilty if convinced the State had proven its case beyond a reasonable doubt and never indicated that he would be unable or unwilling to judge the case fairly and impartially. *Id.* at 129.

With respect to the State's justification that a member of the juror's family had a conviction for conversion, the juror did indicate on his juror questionnaire that a family member had either been charged with or convicted of a crime. However, the State did not ask the juror any questions regarding this response. As a result, the State did not establish who the family member was or the nature or seriousness of the crime alleged, what the relationship of the family member to the prospective juror was, whether the family member was convicted of the crime or only charged, how old such conviction or charge was or how such conviction or charge may have influenced the juror.

Here, the trial court made no express finding as to which of the State's explanations it relied upon in denying Cartwright's challenge; it merely approved the peremptory strike without explanation. *Tr.* at 141, 151. As a result, we cannot determine which of the State's proffered explanations the trial court relied upon when it denied Cartwright's *Batson* challenge. The State failed to inquire into such reasons or to develop anything beyond the most superficial of records regarding its reasons. We conclude that the State's proffered explanations for striking the only African–American juror from the jury panel were pretextual and the result of purposeful discrimination. We, therefore, reverse Cartwright's convictions and remand for a new trial.

## II. Sufficient Evidence

■ Cartwright argues that the State presented insufficient evidence to support his convictions for attempted battery with a deadly weapon. When, as here, reversal is required because of trial error, and a defendant presents a claim of insufficient evidence regarding some of his convictions, an acquittal instead of a new trial is required for such convictions if the proof of guilt is insufficient in light of the evidence presented at trial. *Miller v. State*, 916 N.E.2d 193, 198 (Ind.Ct.App.2009), *trans. denied* (2010). To determine whether retrial is permissible, we address Cartwright's claim of insufficient evidence.

When reviewing the sufficiency of the evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the factfinder's role, not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* Therefore, when confronted with conflicting evidence, we consider it most favorably to the trial court's ruling, and affirm the conviction unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence need not overcome every reasonable hypothesis of innocence. *Id.* at 147. Evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.*

Cartwright contends that the State failed to present sufficient evidence to support his convictions for attempted battery with a deadly weapon against Tiffany and Shaudarekkia. He alleges that the evidence was insufficient because there was no evidence presented that he knowingly or intentionally attempted to batter either Tiffany or Shaudarekkia. Cartwright claims this is because neither of the victims testified that he pointed his handgun at them when he fired the shots and that they both testified that they did not see him actually point the gun at them when he shot.

■ Knowledge and intent are both mental states and, absent an admission by the defendant, the trier of fact must resort to the reasonable inferences from both the direct and circumstantial evidence to determine whether the defendant has the requisite knowledge or intent to commit the offense in question. *Stokes v. State*, 922 N.E.2d 758, 764 (Ind.Ct.App.2010), *trans. denied.* Knowledge or intent may be proven by circumstantial evidence, and it may be inferred from a defendant's conduct and the natural and usual sequence to which such conduct logically and reasonably points. *Id.*

In the present case, the evidence presented established that Cartwright fired shots into the crowd and that Tiffany was a member of that crowd. When the shots were fired, Tiffany was standing outside of her vehicle, assisting Jamar, and a crowd had gathered to see Jamar's injury. Although Tiffany testified that she did not see Cartwright specifically point the gun at her, she did see him point into the crowd "toward us, into the crowd where we was [sic]." *Tr.* at 312. When Tiffany first saw Cartwright approaching, she shouted, "he got a gun [sic]." *Id.* Cartwright then began shooting toward the crowd where Tiffany was standing. The jury could have reasonably inferred from this evidence that, by shooting into the crowd toward where Tiffany was standing, Cartwright intended to harm Tiffany. This inference is further bolstered by the fact that Cartwright began shooting toward Tiffany right after she yelled that he had a gun. We therefore conclude that sufficient evidence was presented to sup-

port his conviction for attempted battery with a deadly weapon as to Tiffany.

■ As to the count with Shaudarekkia as the victim, the evidence presented showed that Cartwright pointed his gun at Shaudarekkia while she was in her vehicle and fired. Although Shaudarekkia testified that she did not believe that Cartwright shot his gun toward her, Tiffany testified that she observed Cartwright point and shoot his gun at Shaudarekkia as Shaudarekkia drove her car. *Id.* at 314. A conviction may be sustained on the uncorroborated testimony of a single witness or victim. *Lay v. State,* 933 N.E.2d 38, 42 (Ind.Ct.App.2010), *trans. denied.* Therefore, the testimony of Tiffany alone was sufficient to allow the jury to reasonably infer that Cartwright intended to harm Shaudarekkia. Sufficient evidence was presented to support his conviction for attempted battery with a deadly weapon with Shaudarekkia as the victim. We therefore conclude that, because there was sufficient evidence to convict Cartwright, he may be retried.

Reversed and remanded.

MATHIAS, J., concurs.

VAIDIK, J., dissents with separate opinion.

VAIDIK, Judge, dissenting.

I disagree with the majority's resolution of Cartwright's *Batson* claim. I believe the trial court was warranted in finding no purposeful discrimination in the State's exercise of its peremptory strike. I would therefore affirm the trial court's ruling as well as its judgment of conviction.

The panelist at issue was questioned in pertinent part:

BY THE COURT: ... Okay, anyone else? Sir, in the back?

\* \* \* \* \* \*

[PANELIST]: I have a frequent problem of going to the restroom.

\* \* \* \* \* \*

BY THE COURT: Okay. All right. All right. Do ... do you need a break now, or will you let me know when you need a break?

[PANELIST]: Oh, yes, definitely.

\* \* \* \* \* \*

[STATE]: [W]as there anything that you heard, any of the questions that you heard earlier that you wanted to respond to?

[PANELIST]: Well, you asked if you want to serve on the jury, and that would be no.

[STATE]: And we appreciate your honesty. You realize you don't get to make that choice.

[PANELIST]: Yes.

[STATE]: The Judge gets the final say, but if you had the opportunity, you would rather not serve, that's what you're saying?

[PANELIST]: (Nods yes).

[STATE]: And you also have a health issue that requires you to have to go to the bathroom quite often?

[PANELIST]: Take a diuretic in the morning, a water pill as it's commonly known.

[STATE]: Now does the medicine that you're taking does that cause you any problems listening or concentrating?

[PANELIST]: No. No. Now, I do have a problem of ... I'm not a good listener, but ... but that's from all my life even school.

[STATE]: I guess that's true. Would you try to listen to the evidence in this case?

[PANELIST]: Well, yes, but you know. Another thing, I'm getting old too, 67.

[STATE]: So if you had your choice you would not serve?

[PANELIST]: No.

\*      \*      \*      \*      \*      \*

[DEFENSE]: [F]rom what you said, you indicated you weren't a good listener, and that your school records bear that out. Would you be able to sit in judgment in this case?

[PANELIST]: Well, I'm not sure. I ... I would try my best, but, you know, my best may not be good enough.

Tr. p. 31, 32, 126–27, 133. The panelist also indicated on a written questionnaire that one of his immediate family members had either been charged with or convicted of criminal conversion. Appellant's App. p. 118.

Incidentally, two other venire-members indicated during voir dire that they had medical conditions which might make jury service difficult. The first had sciatica for which he took pain pills and muscle relaxers. He initially stated that "[a]s long as I take my medicine I'm all right" but later said that he "would rather not serve because of the problems I have and being medicated." *Id.* at 29, 45. A second panelist suffered from anxiety disorder which made her uncomfortable and interfered with her ability to listen and process information. *Id.* at 138. She stated, "If I had had my choice I would not serve." *Id.* at 127. Both jurors were stricken for cause. *Id.* at 89, 139.

The State peremptorily struck the subject black panelist. Cartwright raised a *Batson* challenge, and the State proffered, *inter alia,* the following justifications for its strike: the panelist had health issues, had trouble listening, did not wish to serve, and had a family member who had either been charged with or convicted of a crime.

I agree with the majority that Cartwright made a satisfactory prima facie showing of discrimination and that the State tendered race-neutral explanations for striking the panelist. At issue is the third and final step of the *Batson* challenge, in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. *See Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995).

The trial court's decision on the ultimate question of discriminatory intent represents a finding of fact accorded great deference on appeal and will not be overturned unless clearly erroneous. *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). Deference is necessary because a reviewing court, which analyzes only the transcripts from voir dire, is not as well-positioned as the trial court to evaluate the peremptory challenger's credibility. *Id.* In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. *Id.* As with the state of mind of a juror, evaluation of demeanor and credibility lies peculiarly within a trial judge's province. *Id.*

Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy. *Cockrell,* 537 U.S. at 339, 123 S.Ct. 1029. The court may also

consider whether the justification for the exercise of the peremptory challenge corresponds to a valid challenge for cause. *United States v. Stephens*, 514 F.3d 703, 711 (7th Cir.2008). While the reason offered for a peremptory strike need not rise to the level of a challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character. *Hernandez*, 500 U.S. at 362–63, 111 S.Ct. 1859.

In line with the foregoing, I would conclude that the trial court was warranted in crediting the State's race-neutral explanations for striking the subject panelist. The State's justifications all find basis in the record. In particular, the panelist indicated that he had a health issue that could hinder service and that he had ongoing problems with attentiveness. Noteworthy is that these were the very grounds on which two other venire-members were stricken for cause. These explanations thus become especially persuasive reasons justifying the State's peremptory challenge. *See also Ross v. State*, 665 N.E.2d 599, 602 (Ind. Ct.App.1996) (finding no *Batson* violation where one juror was struck due to urinary problems and another due to difficulty listening). As for the black panelist's disinclination to serve as a juror, the majority maintains that several other non-black panelists expressed similar reluctance. In fact, only two other venire-members expressed a desire not to serve—and both were the above-mentioned panelists already stricken for cause. Finally, the majority stresses that the State posed no follow-up questions about the black panelist's family member who had been either charged with or convicted of conversion. I agree that, if the State's only race-neutral explanation were that the panelist's relative had experience in the criminal justice system, additional information would have been helpful in establishing that explanation's legitimacy. But I believe that the family member's prior charge or conviction—along with the panelist's health issues, difficulty paying attention, and desire not to serve—all together support a finding of no discriminatory intent by the State.

In short, I cannot conclude on this cold record that the State's reasons for striking the panelist were baseless, pretextual, and the result of purposeful discrimination. I believe the trial court's ruling deserves much greater deference, and I would therefore find no *Batson* violation on appeal. For these reasons I respectfully dissent and would affirm the judgment of the trial court.