**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**VALERIE K. BOOTS**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GARY WATTS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1201-CR-24 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable James B. Osborn, Judge
Cause No. 49F15-1108-FD-58567

**August 21, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

## STATEMENT OF THE CASE

Appellant-Defendant, Gary Watts (Watts), appeals his conviction for theft, a Class D felony, Ind. Code § 35-43-4-2.

We affirm.

## ISSUE

Watts raises one issue on appeal, which we restate as: Whether the trial court properly denied his *Batson* challenge.

## FACTS AND PROCEDURAL HISTORY

On August 17, 2011, Sable Lopez (Lopez) was watching television at his landlord's house, while his landlord and employer, James Brown (Brown), was in bed upstairs. Around 9:25 p.m., Lopez heard dragging sounds coming from behind Brown's house. Lopez recognized the noise as coming from the lawnmower he used when he performed gardening for Brown. Lopez ran to the privacy fence outside the house to investigate. After shouting something to whomever was on the other side of the fence, Lopez heard someone running and dragging the lawnmower. Lopez returned to Brown's house and called 911. He and Brown went out to the garage where Brown discovered that his lawnmower was missing. Brown then got in his truck to search for the lawnmower in the alleys around his home.

Indianapolis Metropolitan Police Officer William Amberger (Officer Amberger) responded to the 911 dispatch. Officer Amberger entered an alley near Brown's house

and encountered Watts, who was pushing or dragging the lawnmower down the alley. Assisted by another officer, Officer Amberger conducted a pat-down of Watts' clothing, locating tools in the pockets. Brown later arrived at the scene and identified the lawnmower and the tools as his own. Thereafter, the officers arrested Watts.

On August 17, 2011, the State filed an Information charging Watts with theft, a Class D felony, I.C. § 35-43-4-2. On November 16, 2011, a jury trial was held. The State was represented by two prosecuting attorneys. A panel of fourteen venire persons was called and questioned by both sides. After excusing one venire person for cause, eight others were removed by the parties' peremptory challenges.

The State exercised two of its peremptory challenges to remove two male African-American venire persons, Bonds and Jackson. At a sidebar conference, Watts' counsel made a *Batson* challenge to the removal of these two jurors.[1] The trial court immediately requested a response from the State. After providing its reasons for removing Bonds, one of the prosecuting attorneys provided her explanation for the removal of Jackson.

> [STATE]: Mr. Jackson – he has had a cousin who has been convicted of murder. So he has a family member who's been convicted of a crime, and he's just very, very outspoken. And that's just something that we didn't feel would be good – something that we wanted on the jury.
>
> [TRIAL COURT]: Response.
>
> [WATTS' COUNSEL]: Judge – for one thing, they didn't elicit any facts about the cousin being convicted of murder. It could well be that he felt good about how the State handled that, and he's pro-State as a result of that experience. Um, two, I didn't notice him being particularly outspoken. If

---

[1] Watts does not appeal the removal of Bonds, only the removal of Jackson.

3

any way, I thought he was very neutral – I thought he was very fair to the State. So I don't think that's a sufficient – raising it to a reason.

[…]

[TRIAL COURT]: I – I'm really … the difficulty is – well, not the difficulty, but you have left another African-American juror on the team, so I don't think there's a consistent pattern of striking African-Americans. I do question your rationale behind Mr. Jackson, but you – the rationale is your own, and I don't think given that you've left Ms. White on the jury that there's sufficient information for me to decide that you've decided to strike those just because they're African-American. So I'm going to deny your [*Batson*] challenge on both of those people.

(Transcript pp. 69-71).

The trial court seated the remaining six members of the panel as jurors. Following a recess, a final group of venire persons was questioned and the trial court seated an alternate juror. The trial court then requested Watts' counsel to make his *Batson* argument, followed by the other prosecutor's response.

[WATTS' COUNSEL]: Um – I guess that was our challenge, that they [Bonds and Jackson], eh – they were struck because of their race. Do you want the State [to] provide their, um, reasoning? Or do you want me to just go ahead?

[TRIAL COURT]: Okay. Well, I'll show that your challenge is made and if you want to restate your reasons for why [the State] made those strikes […].

[STATE]: […]. Um, with respect to juror number six, Mr. Jackson – uh, [the other prosecutor] and I were not comfortable with some of his responses. We felt he was a little more outspoken, um, than we were particularly comfortable with, um, and some of his responses we just – unfortunately I don't have notes on the specific response I'm talking about. Um, but we just weren't comfortable with him being on the jury. I would note that there were a few other African-American jurors that the State did not – did not strike.

4

[TRIAL COURT]: Well – let's [not] count the alternate, since that was after the fact, but eh –

[STATE]: That – I was going to – that [was] my next point.

[TRIAL COURT]: Okay – but that Ms. White was an African-American female.

[STATE]: Yes. And also into that was Mr. Jackson's body language during the *voir dire* process.

[TRIAL COURT]: Okay, and as I ruled before, I'm – I'm going to accept the State's reasons as facially reasonable. I'll also note that there was an African-American female that was not excused by the State. So I'll deny the *Batson* challenge.

(Tr. pp. 84-85).

Trial thereafter commenced and Watts was found guilty as charged. On December 16, 2011, the trial court held a sentencing hearing. Watts was sentenced to two years' incarceration at the Department of Correction and one year at community corrections on home detention.

Watts now appeals. Additional facts will be provided as necessary.

DISCUSSION AND DECISION

Watts contends that the trial court erred when it denied his *Batson* objection to the State's peremptory challenge to remove Jackson from the venire. Specifically, he argues that the trial court failed to properly apply the three-step test under *Batson v. Kentucky*, 476 U.S. 79 (1986). Watts concludes that because the trial court failed to properly administer the *Batson* inquiry, the State removed Jackson from the venire based on reasons that were a pretext for racial discrimination.

5

## I. *Batson*

Purposeful racial discrimination in the selection of a jury violates a defendant's right to equal protection. *Ross v. State*, 665 N.E.2d 599, 602 (Ind. Ct. App. 1996). *Batson* and its progeny require the trial court to evaluate claims that a peremptory challenge was racially based by engaging in a three-step process. *See Cartwright v. State*, 962 N.E.2d 1217, 1220 (Ind. 2012). First, a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race. *Id*. at 1221. To make a *prima facie* case of purposeful discrimination, the defendant must show that the excused juror was a member of a cognizable racial group and present an inference that the juror was excluded because of his or her race. *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001).

Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. *Cartwright*, 962 N.E.2d at 1221. Although the explanation must be more than a mere denial of improper motive, it need not be persuasive or even plausible. *Addison v. State*, 962 N.E.2d 1202, 1209 (Ind. 2012). A step two explanation is considered race-neutral if, on its face, it is based on something other than race. *Id*.

Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination. *Cartwright*, 962 N.E.2d at 1221. This third step, the determination of discrimination, is the "duty" of the trial judge, who evaluates the persuasiveness of the State's step-two justification. *See id*. It is then that

6

"implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*).

Also at the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual. *Addison v. State*, 962 N.E.2d at 1210. This may take the form of a side-by-side comparison with similarly situated non-African American jurors who were permitted to serve. *Id*. at 1213 n. 4. Such comparison may also be raised for the first time on appeal; however, review occurs under the stringent fundamental error standard. *Id*. at 1213. The fundamental error exception is "extremely narrow, and applies only when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Id*. Nevertheless, comparing juror responses requires an appellate court to remain mindful that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial;" insofar as "an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable." *Id*. at 1216.

In sum, "the issue is whether the trial court finds the prosecutor's race-neutral explanation credible." *Id*. at 1210. Trial court judges are much better situated than appellate judges to weigh the credibility of the proffered explanation for striking the prospective juror. *See Jeter v. State*, 888 N.E.2d 1257, 1264 (Ind. 2008), *cert. denied*, 555 U.S. 1055 (2008). The trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference, and will be set aside only if found to

7

be clearly erroneous. *Cartwright*, 962 N.E.2d at 1221. The burden of persuasion on a *Batson* challenge rests with the party opposing the strike. *Id*.

## II. *Analysis*

The State used its peremptory challenges to strike both Jackson and Bonds from the jury panel. The removal of some African-American jurors by the use of peremptory challenges does not, by itself, raise an inference of racial discrimination. *Id*. However, where the State offers a "race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing of purposeful discrimination becomes moot." *Addison*, 962 N.E.2d at 1209 n.2. The parties do not dispute that the first step of the *Batson* inquiry is moot since the State offered its reasons why it removed Jackson and the trial court ruled on the issue of discrimination.

The second step of the analysis requires an examination of the State's explanation for exercising the complained of peremptory challenge. The first time Watts' counsel lodged their *Batson* challenge, one prosecuting attorney gave two reasons for the challenge: (1) Jackson had a relative convicted of murder and (2) he was "very, very outspoken" such that the prosecuting attorneys were uncomfortable. (Tr. p. 70). After the alternate juror was selected, a second prosecuting attorney reiterated that Jackson was outspoken and indicated a discomfort with Jackson's responses. This prosecuting attorney, however, gave two additional reasons: (1) the State did not strike other African-American venire persons and (2) that the prosecuting attorneys were uncomfortable with

8

Jackson's body language during *voir dire*. Watts acknowledges that all the foregoing explanations were facially race-neutral. We therefore turn to the third-step of the inquiry.

Watts argues that the trial court misunderstood the law and wrongly conducted its analysis during the third step. Specifically, he contends that the trial court did not critically evaluate the State's reasons for removing Jackson from the venire. Thus, Watts claims, the State was permitted to remove Jackson based on justifications that were a pretext for racial discrimination and the trial court therefore erred in denying his *Batson* challenge. We disagree and find that the trial court adequately discharged its duty and resolved the issue of credibility in the State's favor.

Watts relies upon *Addison* to argue that the trial court failed to discharge its duty since it did not indicate why it found the State's explanations credible. In *Addison*, our supreme court concluded that the trial court conflated steps two and three of the *Batson* inquiry because it simply accepted the State's race-neutral reasons in the face of Addison's unsubstantiated pretext argument. *Addison*, 962 N.E.2d at 1210. The *Addison* court elected to review Addison's *Batson* challenge for fundamental error since an unsubstantiated pretext argument would have ordinarily been deemed waived on appeal. *Id*. at 1213. Ultimately, the supreme court concluded that the State's non-racial justifications were pretextual in light of similar responses from non-African-American venirepersons and the State's mischaracterization of the removed venire person's testimony. *Id*. at 1217.

Watts seizes upon imprecise language used by the trial court to contend that it conflated steps two and three of the *Batson* inquiry. He points to the trial court's professed doubt of the State's race-neutral reasons for removing Jackson and its subsequent determination that such reasons were "facially reasonable" given that another African-American was not removed. (Tr. p. 85). Thus, Watts contends that the trial court failed to properly conduct step three of the *Batson* inquiry without determining whether the State's reasons were "actually reasonable." (Appellant's Br. p. 9).

We note that the trial court is not required to make explicit fact-findings following a *Batson* challenge, especially where a *prima facie* case is acknowledged and the prosecution presents specific non-discriminatory reasons on the record. *Cartwright*, 962 at 1222. Rather than conflating steps two and three of the *Batson* inquiry, the trial court here injected step one considerations in making its step three determination. Although consideration of Watts' *prima facie* case under step one was moot, the trial court may consider the totality of the relevant facts to make its ultimate determination whether defendant carried his burden to prove racial discrimination by the State's use of a peremptory challenge. *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Here, the trial court, though not without some doubt, relied upon the presence of an empaneled African-American juror to resolve the credibility under step three in favor of the State. Mindful that the defendant bears the burden to establish that the State's non-racial justifications were pretextual, we cannot say that the trial court was unable to consider this a factor in its determination of the State's credibility.

10

An *Addison*-type comparative inquiry leads to the same result. Watts argues that the State's failure to question Jackson on his relative's murder conviction, its mischaracterization of Jackson's testimony as outspoken, and testimony of other venire persons who were more opinionated mandate the conclusion that removal of Jackson was racially motivated. The first of these arguments is easily resolved. The failure to follow up with a minority venireperson may not constitute evidence of pretext where no other venirepersons are similarly situated. *See Cartwright*, 962 N.E.2d at 1224. Although other venirepersons testified to their direct experience with the police, the record does not show that any other venire person had a relative convicted of a crime.[2] Next, while the State's claims that Jackson was very outspoken is arguably dubious, attempts to conclusively substantiate this is somewhat frustrated by the lack of juror identification in the transcript. Further, the force of Jackson's response that he would review video evidence to determine whether someone was in possession of stolen goods does not necessarily have less force than other jurors who contested a police officer's radar gun reading or another who remarked that she required further evidence to determine whether an intentional act was accidental. Given all of these circumstances, the deference to the trial court's superior position to weigh the reasons, and the defendant's burden to demonstrate pretext, we cannot conclude that the trial court committed clear error in

---

[2] Watts did not present any juror questionnaires and the record does not contain evidence from which we could determine whether other venirepersons had family members convicted of a crime. *See Cartwright*, 962 at 1223 n. 4.

11

overruling Watts' *Batson* objection to the State's peremptory strike of Jackson.  We therefore affirm the trial court's ruling on Watts' *Batson* challenge.

CONCLUSION

Based on the foregoing, we conclude that the trial court properly denied Watts' *Batson* challenge.

Affirmed.

BAILEY, J. and CRONE, J. concur