**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**PATRICIA CARESS McMATH**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

ANTWAN RUSH, )
)
    Appellant-Defendant, )
)
        vs. )    No. 49A05-1106-CR-295
)
STATE OF INDIANA, )
)
    Appellee-Plaintiff. )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven R. Eichholtz, Judge
Cause No. 49G20-1003-FA-023463

**February 28, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Antwan Rush ("Rush") was convicted of two counts of Dealing in Cocaine, as Class A felonies,[1] and one count of Possession of Marijuana, as a Class A misdemeanor.[2] He now appeals.

We affirm.

**Issues**

Rush poses several issues for our review,[3] which we restate as:

I.    Whether the trial court erred when it ruled against his Batson challenges to the State's peremptory striking of two African Americans from the venire; and

II.   Whether there was sufficient evidence to support his convictions for

   a. Dealing in Cocaine in an Indianapolis house; and

   b. Dealing in Cocaine and Possession of Marijuana in a vehicle Rush had been driving.

**Facts and Procedural History**

In the early morning hours of March 8, 2010, Rush was driving a blue Trailblazer on 38th Street in Indianapolis, when Officer Travis Hunter ("Officer Hunter") observed that the vehicle had a cracked taillight. Officer Hunter initiated a traffic stop and learned that Rush's driving privileges had been suspended. Two other officers, Jeffrey Widmer ("Officer

---

[1] Ind. Code 35-48-4-1.
[2] I.C. § 35-48-4-11.
[3] Rush also challenges the sufficiency of the evidence with respect to the jury's guilty verdicts on numerous lesser included offenses, including Conspiracy to Deal in Cocaine and Possession of Cocaine and a Firearm. Because the trial court did not enter judgment on these verdicts as lesser included offenses of those from which Rush presently appeals and we affirm Rush's convictions today, we do not reach Rush's arguments with respect to the sufficiency of the evidence on the other charges.

Widmer") and Andrew Troxell ("Officer Troxell"), were also present at the scene. Rush's cousin, Ronyai Thompson ("Ronyai"), came to the scene to take possession of the vehicle. Both Rush and Ronyai were anxious for this to occur, but IMPD policy precluded officers from releasing the Trailblazer to Ronyai. Rush was arrested, an inventory search of the Trailblazer was conducted, and the vehicle was towed from the scene to an impound yard.

Also on March 8, 2010, Detective Matthew Stevenson ("Detective Stevenson") of the Indianapolis Metropolitan Police Department's Violent Crimes Unit ("VCU") sought to make contact with Rush in the course of an ongoing investigation in an unrelated matter. Detective Stevenson learned that Rush was at the Marion County Jail's Arrest Processing Center ("APC"), but Rush was released from the APC before Detective Stevenson could make contact with him. Detective Stevenson requested that other members of the VCU place Rush under surveillance as he walked through downtown Indianapolis. The detectives were able to observe Rush for only a brief period before losing sight of him.

While VCU detectives attempted on-foot surveillance of Rush, Detective Stevenson learned of several Indianapolis addresses connected to Rush. Among these were a unit in a duplex on North Carrollton Avenue ("4210 Carrollton") and an apartment on the northeast side of the city ("the San Paulo apartment"). Detective Stevenson requested that VCU detectives place both locations under surveillance that afternoon after the VCU team lost sight of Rush in downtown Indianapolis. Detectives Jean Deddish ("Detective Deddish"), Steven Scott ("Detective Scott"), Tanya Terry ("Detective Terry"), and Henry Gregory ("Detective Gregory") conducted surveillance of 4210 Carrollton. Detective-Sergeant Kerry

3

Buckner ("Sergeant Buckner") conducted surveillance of the San Paulo apartment. Detective Stevenson remained mobile and coordinated the surveillance operations.

During the afternoon of March 8, the detectives observed a white Chevrolet Malibu with a paper license tag drive from 4210 Carrollton to a nearby Walgreen's drug store and back to the duplex. While the Malibu was parked at the Walgreen's store, Rush's brother, Antonio Rush ("Antonio") exited the car, entered the store, purchased a box of latex surgical gloves, and got back in the car, which then returned to 4210 Carrollton. At one point in the afternoon after the white Malibu had returned from the Walgreen's store, Rush emerged from 4210 Carrollton and stood next to the car for several minutes before returning to the interior of the house. Detectives also saw an individual they would later identify as Ronyai twice drive to the duplex in a black Dodge Charger and enter 4210 Carrollton. There was very heavy foot and vehicular traffic to and from 4210 Carrollton that was uncharacteristic of the neighborhood—by one detective's estimate, nearly thirty-five persons—with each person remaining at the residence for only a few minutes before leaving. Detectives recognized this conduct as characteristic of individuals purchasing drugs from the occupants of 4210 Carrollton.

While VCU detectives maintained surveillance on 4210 Carrollton, Detective Stevenson and Detective Michael Condon ("Detective Condon") went to an impound yard to examine the Trailblazer Rush had been driving when he was arrested earlier that day. The inventory search of the vehicle at the time of Rush's arrest had yielded no contraband, but upon approaching the vehicle both detectives detected the scent of raw marijuana. After

4

requesting a canine sniff and that the Trailblazer be towed to a secured IMPD facility, Detective Stevenson left Detective Condon with the vehicle and returned to the neighborhood near 4210 Carrollton.

At around 4:30 that afternoon, Detective Stevenson requested that several of the detectives conducting surveillance on both the Carrollton and San Paulo locations meet at the Indiana State Fairgrounds to discuss a plan for making contact with Rush and any other individuals at 4210 Carrollton. As the detectives prepared to leave the Fairgrounds, a member of the surveillance team reported that the white Malibu was leaving 4210 Carrollton.

Detective Stevenson requested that uniformed police officers stop the car, and he and several other detectives travelled to the scene of the traffic stop. When police stopped the vehicle, they found Antonio driving the car with Rush in the passenger's seat. Each had large sums of cash on their persons.

While the traffic stop was under way, Detectives Scott and Gregory approached the front of 4210 Carrollton. Sergeant Buckner and two other detectives placed themselves at the back of the building to ensure no one left undetected. Detective Gregory knocked on the front door in an attempt to make contact with any individuals inside, while Detective Scott stood next to him. After receiving no reply, Detective Gregory knocked louder. He and Detective Scott heard loud noises coming from inside the house. Shortly after this, Ronyai, still inside the residence, opened a space in the blinds to see who was at the door. After Ronyai saw Detective Scott, he snapped the blinds closed. The detectives heard further noise from inside the house, including Ronyai's voice, but no one came to the door.

5

While Detectives Gregory and Scott stood at the door of 4210 Carrollton, Patricia Thompson ("Patricia"), mother of Rush and Antonio and Ronyai's aunt, arrived by car at the house and explained that she had a contractual interest in the duplex. Detective Gregory and Detective-Sergeant Garth Schwomeyer ("Sergeant Schwomeyer"), another VCU member, spoke with Patricia and requested her consent to enter the house; Patricia refused.

Knowing that older duplexes like the one at 4210 Carrollton often allowed attic access to the adjacent unit in the building, Detective Gregory knocked on the door of the other unit in the duplex, 4212 Carrollton. One of its occupants admitted him to the residence. Detective Gregory explained that police suspected criminal activity in 4210 Carrollton, and obtained identification information from the occupants of 4212 Carrollton. After advising the occupants to remain inside for their safety, Detective Gregory left 4212 Carrollton. Among those in 4212 Carrollton was Ronyai, who had identified himself to Detective Gregory as Sam Jones and provided a date of birth and social security number.

Detective Gregory ran each of 4212 Carrollton's occupants names through police computers and determined that the information Ronyai provided was false. At some point after Detective Gregory left the house, a male occupant of the house emerged, asked to smoke a cigarette, and returned to the interior of 4212 Carrollton after finishing the cigarette. Soon after this, Ronyai, accompanied by a female adult, left the house carrying a child in his arms. Detective Gregory called Ronyai over to ask him about the false identification information he had provided. After handing the child over to his female companion, Ronyai provided correct identification information. Detective Gregory checked the correct

6

information in police computers and determined that Ronyai's driving privileges had been suspended. Because detectives had seen Ronyai driving the black Dodge Charger earlier that day, Detective Terry arrested him.

In the interim, Detective Stevenson sought and obtained search warrants for 4210 Carrollton, the San Paulo apartment, the Trailblazer, and Patricia's vehicle. During their search of 4210 Carrollton, police found drug-related items throughout the first floor of the house, including 281.243 grams of powder cocaine and 90.639 grams of crack cocaine; cooking pans with cocaine residue; numerous rubber gloves and plastic baggies, several of which contained crack cocaine; a twenty-gauge shotgun and shotgun shells; and a loaded .38 Special revolver. Police also found, in the second floor of the house, a panel allowing access into the shared attic between 4210 Carrollton and 4212 Carrollton, which permitted Ronyai to move between the two units in the duplex while avoiding police observation.

Detective Condon and Sergeant Schwomeyer returned to their office to conduct a search of the Trailblazer, which had been locked in a secured bay at an IMPD facility. Sergeant Schwomeyer searched the vehicle, including "void areas" in the console behind the glove box. (Tr. 762.) In one of these areas, Sergeant Schwomeyer discovered 62.8915 grams of powder cocaine, 16.224 grams of crack cocaine, and 2.15 grams of marijuana.

On March 23, 2010, the State charged Rush with two counts of Conspiracy to Commit Dealing in Cocaine, each as Class A felonies[4]; two counts of Dealing in Cocaine, as Class A

---

[4] I.C. §§ 35-41-5-2 & 35-48-4-1.

felonies; two counts of Possession of Cocaine, as a Class C felony[5]; Possession of Cocaine and a Firearm, as a Class C felony[6]; Unlawful Possession of a Firearm by a Serious Violent Felon, as a Class B felony[7]; and Possession of Marijuna, as a Class A misdemeanor. Antonio, Ronyai, and Patricia were charged with related offenses.

On April 18, 2011, the State moved to dismiss one charge of Conspiracy to Commit Dealing in Cocaine against Rush, which the trial court granted that day. The trial court also conducted jury selection on April 18, 2011. During voir dire, the State peremptorily challenged two African-American jurors from the venire. The trial court raised sua sponte whether the State's peremptory challenges discriminated against the potential jurors under the dictates of Batson v. Kentucky, 476 U.S. 79 (1986). After the trial court granted the State's challenges, Rush and the other defendants objected, and the trial court overruled the objections. On April 29, 2011, Rush and the other defendants filed a joint motion for mistrial based upon the alleged Batson violations.

A jury trial was conducted from May 2, 2011 to May 6, 2011. After the close of the State's evidence, all four defendants moved for judgment on the evidence. The trial court granted Patricia's motion and dismissed all the charges against her, but denied the others' motions. On May 6, 2011, the jury found Rush guilty of all the remaining charges.[8]

On May 31, 2011, the trial court entered judgments of conviction against Rush for the

---

[5] I.C. § 35-48-4-6.
[6] I.C. § 35-48-4-6.
[7] I.C. § 35-47-4-5.
[8] Antonio and Ronyai were also found guilty of numerous charges.

two counts of Dealing in Cocaine, sentencing him to thirty-five years imprisonment for each offense, and one count of Possession of Marijuana, sentencing him to one year of imprisonment; the sentences were run concurrent to one another.

This appeal followed.

## Discussion and Decision

### Batson Challenges

Rush contends that the trial court erred when it overruled his objection to the State's use of peremptory challenges to strike two African-American jurors from the venire and denied his subsequent motion for a mistrial.

The Indiana Code provides that, in prosecutions for offenses other than murder, the State may use as many as five peremptory challenges to exclude venirepersons from the jury. I.C. §§ 35-37-1-3(c) & 35-37-1-4. Generally, "a peremptory challenge may be [exercised] for no cause whatsoever." Bond v. State, 273 Ind. 233, 237, 403 N.E.2d 812, 816 (1980). In Batson v. Kentucky, however, the United States Supreme Court qualified that principle to preclude the use of peremptory challenges to exclude venirepersons from a jury solely on the basis of race. 476 U.S 79 (1986), modified by Powers v. Ohio, 499 U.S. 400 (1991) (extending Batson to cases where the defendant and excluded juror were of different races).

In Batson, the Court "determined that the prosecutor's use of a peremptory challenge to strike a potential juror solely on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment." Jeter v. State, 888 N.E.2d 1257, 1262 (Ind. 2008). Batson set forth a three-step test to determine whether the State has used a peremptory challenge to

9

strike improperly a juror from the venire solely because of that individual's race. First, the party contesting the use of a peremptory challenge must make a prima facie showing of discrimination based upon race against the member of the venire. Batson, 476 U.S. at 96-97. Next, the party using a peremptory challenge may "present a race-neutral explanation for using the challenge." Jeter, 888 N.E.2d at 1263 (citing Batson, 476 U.S. at 97). If the party seeking to strike a member of the venire provides a race-neutral explanation, "the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination." Id. (citing Batson, 476 U.S. at 98).

Even a single instance of discrimination because of a venireperson's race is grounds for reversal where a trial court rejects a Batson challenge. Killebrew v. State, 925 N.E.2d 399, 401 (Ind. Ct. App. 2010), trans. denied. Because of the importance of the demeanor of potential jurors and the prosecutor when the trial court evaluates a race-neutral explanation for a peremptory challenge, we afford broad latitude to the trial court's decision in such matters. Thus, we reverse only where the trial court's decision is clearly erroneous. Id.

Here, the trial court raised sua sponte the question of whether the Batson line of cases rendered the State's peremptory challenges improper. Rush contends that the State's use of peremptory challenges to exclude two African-American members of the venire violated the Fourteenth Amendment and requests that we reverse his conviction and remand for a new trial. The State argues that Rush waived this issue on appeal and that the peremptory challenges were nonetheless not improperly granted.

While we cannot agree with the State that Rush waived this issue on appeal, we

10

conclude that the trial court did not err when it granted the State's peremptory challenges as to the two African-American members of the venire. Central to Rush's contention that the trial court erred is this court's decision in <u>Killebrew</u>, where we applied the Supreme Court's decision in <u>Snyder v. Louisiana</u>, 552 U.S. 472 (2008), and ordered a new trial. In <u>Killebrew</u>, the State used peremptory challenges to strike all five African-American members of the venire. <u>Killebrew</u>, 925 N.E.2d at 400-401. On appeal, another panel of this court compared the answers given by non-white members of the venire who were stricken from the jury to those of white members of the venire whom the State did not strike. Based upon these comparisons with regard to one of the venirepersons, the <u>Killebrew</u> panel concluded that the trial court erroneously permitted the State to exercise a peremptory challenge in violation of the Fourteenth Amendment, reversed Killebrew's convictions, and remanded the case for a new trial. <u>Id.</u> at 402-403.

The result in <u>Killebrew</u> was based upon application of the Supreme Court's rationale in <u>Snyder</u>. The <u>Snyder</u> Court looked at the prosecutor's use of peremptory challenges to strike five African Americans from the venire, giving close scrutiny to the state's race-neutral reasons for striking potential jurors when those explanations applied equally—if not more urgently—to white jurors whom the state did not seek to strike from the panel. The Court looked not only at the conduct of voir dire itself, but also at the course of the trial as a whole when it reversed Snyder's conviction. <u>Snyder</u>, 552 U.S. at 477-86.

Here, the trial court requested sua sponte that the State explain its peremptory challenges as to the two African-American venirepersons. The State pointed to both

11

individuals' statements that they wanted to be presented with scientific evidence connecting Rush to the drugs at issue in the case or other evidence of actual possession. When the trial court observed that other members of the venire had also expressed that wish, the deputy prosecutor further noted that one of the two potential jurors' brothers was a police officer with whom the deputy prosecutor had worked in the past and she had a bad relationship with him. The deputy prosecutor was therefore concerned that the potential juror might be biased against her. After listening to the State's race-neutral explanations and the defendants' responses, and observing that the State's reasons were of special concern because we had recently reversed the trial court's rejection of a Batson challenge in Killebrew, the trial court granted the State's peremptory strikes. On appeal, Rush contends that the State's race-neutral rationale was pretextual and that the trial court's determination to the contrary was in error.

With an eye toward the record as a whole, as in Killebrew and Snyder, we cannot agree. As to the juror with whose brother the prosecutor had prior dealings, Rush does not point to any disparate treatment of similarly-situated non-blacks on the jury—indeed, our review of the record reveals that several individuals whose close relatives were associated with law enforcement were stricken from the venire. So too were other individuals stricken who, like the other black juror whom the State sought to strike with a peremptory challenge, expressed difficulty with constructive possession, a concept central to the State's case. Moreover, the State sought to strike these venirepersons in the first round of voir dire, and two subsequent rounds of jury selection passed without further event. Finally, the trial

12

court's expressed sensitivity to <u>Batson</u>-related issues and its decision to permit the peremptory strikes after raising those issues sua sponte further weighs against a conclusion that the trial court erred when it granted the State's peremptory challenges over Rush's objection.

In view of the entirety of the trial record and in light of the issues presented at trial, we cannot conclude that the trial court erred when it permitted the State to use its peremptory challenges to strike two African-American members of the venire.

<u>Sufficiency of the Evidence</u>

Rush also challenges the sufficiency of the evidence with respect to both charges of Dealing in Cocaine and the charge of Possession of Marijuana. Our standard of review in sufficiency matters is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. <u>Drane v. State</u>, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence. <u>Id.</u> We will affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." <u>Id.</u> (quoting <u>Jenkins v. State</u>, 726 N.E.2d 268, 270 (Ind. 2000)). "The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." <u>Id.</u> (quoting <u>Pickens v. State</u>, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

Here, Rush was convicted of two counts of Dealing in Cocaine and one count of Possession of Marijuana. To obtain convictions against Rush for Dealing in Cocaine, as a Class A felony, the State was required to prove beyond a reasonable doubt for each count that Rush knowingly possessed, with intent to deliver, cocaine in an amount greater than three

13

grams. I.C. § 35-48-4-1(a)(2) & (b)(1); App. 34, 36. To obtain a conviction against Rush for Possession of Marijuana, as a Class A misdemeanor, the State was required to prove beyond a reasonable doubt that Rush knowingly possessed marijuana in an aggregate amount of less than 30 grams. I.C. § 35-48-4-11; App. 36.

With respect to each charge, Rush contends only that there was insufficient evidence of his constructive possession of the drugs in 4210 Carrollton and the Trailblazer. Constructive possession occurs when an individual "'has direct physical control over the item.'" Massey v. State, 816 N.E.2d 979, 989 (Ind. Ct. App. 2004) (quoting Henderson v. State, 715 N.E.2d 833, 835 (Ind. 1999)). "In order to prove constructive possession, the State must show that the defendant has both (1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband." Iddings v. State, 772 N.E.2d 1006, 1015 (Ind. Ct. App. 2002), trans. denied.

"The State must demonstrate the defendant's knowledge of the presence of the contraband to prove the intent element." Grim v. State, 797 N.E.2d 825, 832 (Ind. Ct. App. 2003). Where the defendant has possession of the premises where contraband is discovered, but that possession is not exclusive, the defendant's knowledge may be inferred from additional circumstances, and must be "able to reduce the controlled substance to his personal possession." Id. "In a manufacturing type [sic] setting, a defendant's presence does not compel a conviction but it does present a prima facie case of possession." Moore v. State, 613 N.E.2d 849, 851 (Ind. Ct. App. 1993). Additional circumstances that Indiana courts have found to support an inference that a defendant had "'knowledge of the nature of

14

the controlled substances and their presence,'" Gee v. State, 810 N.E.2d 338, 341 (Ind. 2004) (quoting Lampkins v. State, 682 N.E.2d 1268, 1275 (Ind. 1997), modified on reh'g, 685 N.E.2d 698 (Ind. 1997)), include:

> (1) incriminating statements made by the defendant, (2) attempted flight or furtive gestures, (3) location of substances like drugs in settings that suggest manufacturing, (4) proximity of the contraband to the defendant, (5) location of the contraband within the defendant's plain view, and (6) the mingling of the contraband with other items owned by the defendant.

Id. Our courts have also applied these circumstances to cases involving constructive possession of contraband in a vehicle with multiple occupants. Henderson v. State, 715 N.E.2d 833, 836 (Ind. 1999).

### 4210 Carrollton

We turn first to the cocaine found in 4210 Carrollton. Rush argues that the evidence introduced by the State is insufficient to sustain his conviction because "while [he] may have had a possessory interest in 4210 North Carrollton, it was not exclusive and the State did not present any additional evidence to demonstrate" Rush's knowledge that there was cocaine in the home. (Appellant's Br. 15.) Rush notes that he was arrested away from 4210 Carrolton and that numerous other factors listed in Gee did not apply.

Rush's observations, though accurate, nonetheless fail to establish that there was insufficient evidence to support his conviction. Rush held some form of possessory interest in 4210 Carrollton, as evidenced by his Bureau of Motor Vehicles record, which listed him as residing at that address. During their surveillance of 4210 Carrollton on March 8, 2011, detectives observed a white Chevrolet Malibu park first at a Chinese food restaurant and

15

again at Walgreen's, where Rush's brother, Antonio, got out of the passenger side of the car and purchased surgical gloves. The vehicle returned to 4210 Carrollton, where detectives later saw Rush leave the residence, stand next to the car for several minutes, and then return to the interior of the residence. When police initiated the traffic stop of the Malibu on 46th Street later that day in an effort to apprehend Rush, Rush and Antonio were the sole occupants of the car. Upon arrest, Rush had a large sum of cash on his person, as did Antonio.

The first floor of 4210 Carrollton was relatively small, with three rooms arranged in a straight line from front to back. The middle room had a couch, chair, and television. In the rear room was a kitchen with a serving window facing the middle room. The middle room on the first floor of the small residence had a shotgun leaning against the wall near the kitchen, and a .38 revolver tucked into the couch with the grip of the pistol protruding from underneath a cushion. In the kitchen, cooking implements with drug residue on them, powder and crack cocaine in various amounts, and baking soda, which cocaine dealers often use to dilute pure or nearly pure cocaine for manufacture and sale, were all in plain view. So too were used surgical gloves, a Walgreen's bag, and a box of Walgreen brand surgical gloves.

In short, detectives testified that they observed Rush entering and leaving on numerous occasions a residence for which he held a possessory interest and which bore substantial markings of being a drug manufacturing setting, and occupying a vehicle that was used to obtain supplies for that operation. Detectives Deddish and Terry testified that they

16

observed upwards of thirty individuals briefly visit 4210 Carrollton, a pattern of conduct that officers testified was indicative of a location where occupants were selling drugs. Upon apprehending Rush during the traffic stop on 46th Street during the afternoon of March 8, 2010, Rush was found in possession of a large amount of cash. In light of this evidence, we cannot conclude that there was insufficient evidence from which the jury could infer that Rush knew of the cocaine in the residence.

*The Trailblazer*

Turning now to Rush's challenge with respect to the cocaine and marijuana found in the Trailblazer, we reach a similar conclusion. As noted above, sufficient evidence was adduced to support the conclusion that Rush was dealing in cocaine. Rush was arrested in the early morning hours of March 8, 2010, while driving a vehicle in which 62.8915 grams of powder cocaine, 16.224 grams of crack cocaine, and 2.15 grams of marijuana were concealed behind the glove box. Sergeant Schwomeyer testified that this area is accessible only by removing the glove box from the console to reveal a void area in the vehicle's console, and that this is an area drug dealers frequently use to hide contraband. The Trailblazer was registered to Patricia, but listed 4210 Carrollton—the address on Rush's driver's record—as its registration address, rather than Patricia's residence at San Paulo. Officers Hunter and Widmer testified that Rush was unusually concerned with trying to persuade them to allow Ronyai to take possession of the Trailblazer rather than towing the vehicle—and that Rush was more concerned with that than with his passenger or with being arrested himself.

Taken together with the evidence of Rush's involvement with the cocaine dealing at

17

4210 Carrollton, we cannot conclude that there was insufficient evidence from which the jury could infer that Rush knew that there was cocaine and marijuana hidden in the vehicle. We therefore conclude that there was sufficient evidence from which the jury could conclude that Rush was in constructive possession of the drugs found in both places, and affirm Rush's convictions for Dealing in Cocaine and Possession of Marijuana.

## Conclusion

The trial court did not err when it denied Rush's <u>Batson</u> challenges to the State's peremptory strikes of two African-American jurors. There was sufficient evidence to support Rush's convictions for Dealing in Cocaine and Possession of Marijuana.

Affirmed.

BAKER, J., and DARDEN, J., concur.