# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**STEPHEN GERALD GRAY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| RONYAI THOMPSON, ) | |
| ) | |
| Appellant-Defendant, ) | |
| ) | |
| vs. ) | No. 49A05-1106-CR-323 |
| ) | |
| STATE OF INDIANA, ) | |
| ) | |
| Appellee-Plaintiff. ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Steven R. Eichholtz, Judge
Cause No. 49G20-1003-FA-23467

**March 29, 2012**

**OPINION - FOR PUBLICATION**

**BAILEY, Judge**

**Case Summary**

Ronyai Thompson ("Thompson") was convicted of Dealing in Cocaine, as a Class A felony.[1]  He now appeals.

We affirm.

**Issue**

Thompson raises three issues for our review, which we restate as:

I.    Whether the trial court abused its discretion when it denied his motion to dismiss the charges against him under Indiana's statute barring successive prosecutions;

II.    Whether the trial court improperly denied his <u>Batson</u> challenges to the State's peremptory striking of two African-American jurors; and

III.    Whether there is sufficient evidence to support the conviction.

**Facts and Procedural History**

In the early morning hours of March 8, 2010, Thompson's cousin, Antwan Rush ("Antwan"), was driving on 38th Street in Indianapolis, when Officer Travis Hunter ("Officer Hunter") observed that Antwan's vehicle had a cracked taillight.  Officer Hunter initiated a traffic stop and learned that Antwan's driving privileges had been suspended.  Antwan was arrested and the vehicle was towed from the scene to an impound yard.

Also on March 8, 2010, Detective Matthew Stevenson ("Detective Stevenson") of the Indianapolis Metropolitan Police Department's Violent Crimes Unit ("VCU") sought to make contact with Antwan in the course of an ongoing investigation in an unrelated matter.

---

[1] Ind. Code § 35-48-4-1.

Detective Stevenson learned that Antwan was at the Marion County Jail's Arrest Processing Center ("APC"), but Antwan was released from the APC before Detective Stevenson could make contact with him. Detective Stevenson requested that other members of the VCU place Antwan under surveillance as he walked through downtown Indianapolis. The detectives were able to observe Rush for only a brief period before losing sight of him.

While VCU detectives attempted on-foot surveillance of Antwan, Detective Stevenson learned of several Indianapolis addresses connected to Antwan. Among these was a unit in a residential duplex on North Carrollton Avenue ("4210 Carrollton"). Detective Stevenson requested that VCU detectives place 4210 Carrollton under surveillance after the VCU team lost sight of Antwan in downtown Indianapolis. Detectives Jean Deddish ("Detective Deddish"), Steven Scott ("Detective Scott"), Tanya Terry ("Detective Terry"), and Henry Gregory ("Detective Gregory") conducted surveillance on the residence. Detective Stevenson remained mobile and coordinated the surveillance operations.

During the afternoon of March 8, detectives saw an individual they would later identify as Thompson twice drive to the duplex in a black Dodge Charger and enter 4210 Carrollton. The detectives also observed very heavy foot and vehicular traffic to and from 4210 Carrollton that was uncharacteristic of the neighborhood—by one detective's estimate, nearly thirty-five persons—with each visitor remaining at the residence for only a few minutes before leaving. Detectives recognized this conduct as characteristic of individuals purchasing drugs from the occupants of 4210 Carrollton.

At around 4:30 that afternoon, Detective Stevenson requested that several of the

3

detectives conducting surveillance on 4210 Carrollton meet at the Indiana State Fairgrounds to discuss a plan for making contact with Antwan and any other individuals at 4210 Carrollton. As the detectives prepared to leave the Fairgrounds, a member of the surveillance team reported that a vehicle was leaving 4210 Carrollton.

Detective Stevenson requested that uniformed police officers stop the car, and he and several other detectives traveled to the scene of the traffic stop. Police arrested Antwan and his brother Antonio Rush ("Antonio") at this time. Each had large sums of cash on his person.

While the traffic stop was under way, Detectives Scott and Gregory approached the front of 4210 Carrollton. Detective-Sergeant Kerry Buckner ("Sergeant Buckner") and two other detectives placed themselves at the back of the building to ensure no one left undetected. Detective Gregory knocked on the front door in an attempt to make contact with any individuals inside, while Detective Scott stood next to him. After receiving no reply, Detective Gregory knocked louder. He and Detective Scott heard loud noises coming from inside the house.

Shortly after this, Thompson, who was still inside the residence, opened a space in the blinds to see who was at the door. Detective Scott saw Thompson through the space in the blinds, and observed Thompson had a surgical glove covering the hand that had opened the blinds. After he saw Detective Scott, Thompson snapped the blinds closed. The detectives heard further noise from inside the house, including Thompson's voice, but no one came to the door.

4

While Detectives Gregory and Scott stood at the door of 4210 Carrollton, Patricia Thompson ("Patricia"), mother of Antwan and Antonio and Thompson's aunt, arrived by car at the house and explained that she had a contractual interest in the duplex. Detective Gregory and Detective-Sergeant Garth Schwomeyer ("Sergeant Schwomeyer"), another VCU member, spoke with Patricia and requested her consent to enter the house; Patricia refused.

Knowing that older duplexes like the one at 4210 Carrollton often allowed attic access to the adjacent unit in the building, Detective Gregory knocked on the door of the other unit in the duplex, 4212 Carrollton. One of its occupants admitted him to the residence. Detective Gregory explained that police suspected criminal activity in 4210 Carrollton, and obtained identification information from the occupants of 4212 Carrollton.

Among those in 4212 Carrollton was Thompson, who first appeared to Detective Gregory only briefly by peeking his head around a corner. Thompson later came into the living room of the home, identified himself to Detective Gregory as Sam Jones, and provided a date of birth and social security number. After advising the occupants to remain inside for their safety, Detective Gregory left 4212 Carrollton.

Detective Gregory ran each of 4212 Carrollton's occupants names through police computers and determined that the information Thompson had provided was false. At some point after Detective Gregory left the house, a male occupant of the house emerged, asked to smoke a cigarette, and returned to the interior of 4212 Carrollton after finishing the cigarette. Soon after this, Thompson left the house carrying a child in his arms and in the company of an adult female. Detective Gregory called Thompson over to ask him about the false

5

identification information he had provided.

After handing the child over to his female companion, Thompson provided correct identification information. Detective Gregory checked the correct information in police computers and determined that Thompson's driving privileges had been suspended. Because detectives had seen Thompson driving the black Dodge Charger earlier that day, Detective Terry arrested him. When asked why he was at 4212 Carrollton, Thompson stated that he was there to speak with a female occupant of the house.

In the interim, Detective Stevenson sought and obtained search warrants for 4210 Carrollton, another location, and vehicles associated with Antwan and Patricia. During their search of 4210 Carrollton, police found drug-related items and weapons throughout the first floor of the house, including 281.243 grams of powder cocaine and 90.639 grams of crack cocaine; cooking pans with cocaine residue; numerous rubber gloves and plastic baggies, several of which contained crack cocaine; a twenty-gauge shotgun and shotgun shells; and a loaded .38 Special revolver. Police also found a panel in the second floor of the house allowing access into the shared attic between 4210 Carrollton and 4212 Carrollton, which permitted Thompson to move between the two units in the duplex while avoiding police observation.

On March 9, 2010, under Cause Number 49G20-1003-CM-18160 ("CM-18160"), the State charged Thompson with Driving While Suspended, as a Class A misdemeanor[2], based upon the detectives' observation of his conduct on March 8.

---

[2] I.C. § 9-24-19-2.

6

In the instant case, on March 23, 2010, under Cause Number 49G20-1003-FA-23467 ("FA-23467"), the State charged Thompson with Conspiracy to Commit Dealing in Cocaine, as a Class A felony[3]; Dealing in Cocaine, as a Class A felony; Possession of Cocaine, as a Class C felony[4]; Possession of Cocaine and a Firearm, as a Class C felony[5]; Carrying a Handgun without a License, as a Class C felony[6]; Driving while Suspended, as a Class A misdemeanor; and Carrying a Firearm without a License, as a Class A misdemeanor. The Driving While Suspended charge in FA-23467 was for the same offense as the charge in CM-18160. Antwan, Antonio, and Patricia were charged with related offenses.

On September 9, 2010, Thompson pled guilty to the single count of Driving While Suspended in CM-18160. On January 24, 2011, Thompson filed a motion to dismiss the charges against him in FA-23467 under Indiana's successive prosecution statute, Indiana Code section 35-41-4-4. The trial court denied the motion on January 28, 2011.

On April 18, 2011, in FA-23467, the State moved to dismiss both counts of Carrying a Handgun without a License and the count of Driving While Suspended, which the trial court granted that day. The trial court also conducted jury selection on April 18, 2011. During voir dire, the State peremptorily challenged two African-American jurors from the venire. The trial court raised sua sponte whether the State's peremptory challenges discriminated against the potential jurors under Batson v. Kentucky, 476 U.S. 79 (1986). After the trial

---

[3] I.C. §§ 35-41-5-2 & 35-48-4-1.
[4] I.C. § 35-48-4-6.
[5] I.C. § 35-48-4-6.
[6] I.C. § 35-47-2-1

7

court granted the State's challenges, Thompson and the other defendants objected, and the trial court overruled the objections.

At a pre-trial hearing on April 29, 2011, Thompson and the other defendants filed a joint motion for mistrial based upon the alleged Batson violations, which the trial court denied. Also during the hearing, Thompson orally renewed his motion to dismiss the charges in FA-23467 under the successive prosecution statute. The trial court again dismissed the charges.

A jury trial was conducted from May 2, 2011 to May 6, 2011. After the close of the State's evidence, all four defendants moved for judgment on the evidence. The trial court granted Patricia's motion and dismissed all the charges against her, but denied the others' motions. On May 6, 2011, the jury found Thompson guilty of all the remaining charges.[7]

On May 31, 2011, the trial court conducted a sentencing hearing, at the conclusion of which it entered judgment of conviction against Thompson for only one count of Dealing in Cocaine, as a Class A felony. The trial court then sentenced Thompson to thirty-five years imprisonment, with ten years suspended to probation.

This appeal followed.

**Discussion and Decision**

Denial of Thompson's Motion to Dismiss

Thompson contends that the trial court improperly denied his motion to dismiss, which relied upon Indiana's successive prosecution statute, because he was convicted of Driving

---

[7] Antwan and Antonio were also found guilty of numerous charges.

While Suspended in a prior prosecution for the same Driving While Suspended offense that was charged and later dismissed in this case. Because Thompson appeals the trial court's denial of a motion to dismiss, we review the trial court's decision for an abuse of discretion. Haywood v. State, 875 N.E.2d 770, 772 (Ind. Ct. App. 2007). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or when the court misinterprets the law. Id.

The successive prosecution statute provides, in relevant part:

A prosecution is barred if all of the following exist:

> (1) There was a former prosecution of the defendant for a different offense or for the same offense based on different facts.

> (2) The former prosecution resulted in an acquittal or a conviction of the defendant or in an improper termination under section 3 of this chapter.

> (3) The instant prosecution is for an offense with which the defendant should have been charged in the former prosecution.

I.C. § 35-41-4-4(a). The State and Thompson agree that subsections 35-41-4-4(a)(1) and (2) have been satisfied; their dispute centers on whether subsection (a)(3) has been met, that is, whether the drug charges for which Thompson was prosecuted should have been charged in the prior case in which Thompson was convicted for Driving While Suspended.

The statute's use of the phrase, "'should have been charged' must be read in conjunction with Indiana's joinder statute." Williams v. State, 762 N.E.2d 1216, 1219 (Ind. 2002). The joinder statute provides:

A defendant who has been tried for one (1) offense may thereafter move to dismiss an indictment or information for an offense which could have been

9

joined for trial with the prior offenses under section 9 of this chapter. The motion to dismiss shall be made prior to the second trial, and shall be granted if the prosecution is barred by reason of the former prosecution.

I.C. § 35-34-1-10(c).

This section of the Indiana Code relies upon the prior section, which states:

Two (2) or more offenses may be joined in the same indictment or information, with each offense stated in a separate count, when the offenses:

> (1) are of the same or similar character, even if not part of a single scheme or plan; or

> (2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan.

I.C. § 35-34-1-9(a). To determine whether contemporaneous crimes are part of a single scheme or plan, we look to whether the offenses are "connected by a distinctive nature, have a common modus operandi, and a common motive." Allen v. State, 956 N.E.2d 195, 197 (Ind. Ct. App. 2011) (quoting Williams, 762 N.E.2d at 1220) (quotation marks omitted).

"'Thus, our legislature has provided that, where two or more charges are based on the same conduct or on a series of acts constituting parts of a single scheme or plan, they should be joined for trial.'" Williams, 762 N.E.2d at 1219 (quoting with approval State v. Wiggins, 661 N.E.2d 878, 880 (Ind. Ct. App. 1996)) (emphasis in original). The statute serves as "a check upon the otherwise unlimited power of the State to pursue successive prosecutions." Wiggins, 661 N.E.2d at 881. "Where the State chooses to bring multiple prosecutions for a series of acts constituting parts of a single criminal transaction, it does so at its own peril." Williams, 762 N.E.2d at 1219.

Thompson contends that the Driving While Suspended charge was part of a scheme or plan—"a single criminal transaction." Id. The State charged Thompson with the same Driving While Suspended offense in two different charging instruments—once in CM-18160 and once in this case. Thompson was convicted in CM-18160 before trial commenced in this case. The Driving While Suspended charge in the present case remained pending until the State dismissed the charge on April 18, 2011, the day on which voir dire was conducted.

Though the procedural aspects of Thompson's case are not unlike those of cases like Williams and Allen, we cannot conclude that the Driving While Suspended offense is part of a single scheme or plan along with the drug-related offenses from which he presently appeals.

Detectives arrested Thompson for Driving While Suspended because they recognized him as the driver of the black Charger before they entered 4210 Carrollton and discovered the cocaine and firearms that led to his conviction in this case. While Thompson's Driving While Suspended offense is close in time and location to the offenses that led to his convictions here, there is no evidence that his Driving While Suspended offense was part of "a single criminal transaction." Officers twice saw Thompson drive the black Charger to 4210 Carrollton over the course of several hours on the afternoon of March 8, 2010. Police had placed the residence under surveillance in order to make contact with Antwan for purposes unrelated to the narcotics charges in the present case. Upon providing accurate identification to police after exiting 4212 Carrollton, Thompson was determined to have been driving while his license was suspended.

11

Yet Thompson's driving had no apparent connection to the drug manufacturing and sales occurring in the house; it was merely transportation to and from 4210 Carrollton. There is no evidence that Thompson transported any supplies for the manufacturing or sale of the drugs, and the police recovered no drugs or associated paraphernalia when they searched the black Charger. Thompson's case is therefore unlike those cases in which this court and our supreme court have concluded that the State was barred from pursuing charges that should have been joined. Cf. Williams, 762 N.E.2d at 1217-18, 1220 (concluding sequential prosecution was barred when the defendant was convicted of Residential Entry and Possession of Cocaine and in a separate action with Dealing in Cocaine and Possession of Cocaine, all stemming from a single drug transaction); Allen, 956 N.E.2d at 196, 198 (concluding sequential prosecution was barred where defendant was convicted of Visiting a Common Nuisance and prosecuted in a separate case for Dealing in Heroin, where the defendant was charged with selling heroin in the course of conduct that gave rise to the Visiting a Common Nuisance offense).

Better practice might have been for the State to join all the charges against Thompson.[8] But because there was no evidence that Thompson's Driving While Suspended

---

[8] The State argues that it lacked an opportunity to obtain confirmation that cocaine had been found in 4210 Carrollton in time to join the charges into a single case. The State relies on State v. McDonald, 954 N.E.2d 1031 (Ind. Ct. App. 2011), where nearly two years elapsed between the State's initial prosecution of the defendant for a sex offense against one of his children in 2008 and a subsequent prosecution as to another child in 2010. The two-year delay in that case was a result of the second child's inability to communicate verbally in a manner sufficient to give rise to probable cause to pursue a prosecution. Here, the delay between the Driving While Suspended charge in CM-18160 and the charges in this case was a mere two weeks. Thompson was not convicted in CM-18160 until January 2011, nearly nine months after his arrest. Thus, we find the State's argument unpersuasive.

offense in CM-18160 was part of a single scheme or plan with the drug offenses in this case, we conclude that the trial court did not abuse its discretion when it denied Thompson's motion to dismiss the charges against him.

Batson Challenges

Thompson also contends that the trial court erred when it overruled his objection to the State's use of peremptory challenges to strike two African-American jurors from the venire and denied his subsequent motion for a mistrial.

The Indiana Code provides that, in prosecutions for offenses other than murder, the State may use as many as five peremptory challenges to exclude venirepersons from the jury. I.C. §§ 35-37-1-3(c) & 35-37-1-4. Generally, "a peremptory challenge may be [exercised] for no cause whatsoever." Bond v. State, 273 Ind. 233, 237, 403 N.E.2d 812, 816 (1980). In Batson v. Kentucky, however, the United States Supreme Court qualified that principle to preclude the use of peremptory challenges to exclude venirepersons from a jury solely on the basis of race. 476 U.S 79 (1986), modified by Powers v. Ohio, 499 U.S. 400 (1991) (extending Batson to cases where the defendant and excluded juror were of different races).

In Batson, the Court "determined that the prosecutor's use of a peremptory challenge to strike a potential juror solely on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment." Jeter v. State, 888 N.E.2d 1257, 1262 (Ind. 2008). Batson set forth a three-step test to determine whether the State has used a peremptory challenge to strike improperly a juror from the venire solely because of that individual's race. First, the party contesting the use of a peremptory challenge must make a prima facie showing of

13

discrimination based upon race against the member of the venire. <u>Batson</u>, 476 U.S. at 96-97. Next, the party using a peremptory challenge may "present a race-neutral explanation for using the challenge." <u>Jeter</u>, 888 N.E.2d at 1263 (citing <u>Batson</u>, 476 U.S. at 97). If the party seeking to strike a member of the venire provides a race-neutral explanation, "the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination." <u>Id.</u> (citing <u>Batson</u>, 476 U.S. at 98).

Even a single instance of discrimination because of a venireperson's race is grounds for reversal where a trial court improperly rejects a <u>Batson</u> challenge. <u>Killebrew v. State</u>, 925 N.E.2d 399, 401 (Ind. Ct. App. 2010), <u>trans. denied</u>. Because of the importance of the demeanor of potential jurors and the prosecutor when the trial court evaluates a race-neutral explanation for a peremptory challenge, we afford broad latitude to the trial court's decision in such matters. Thus, we reverse only where the trial court's decision is clearly erroneous. <u>Id.</u>

Here, the trial court raised sua sponte the question of whether the <u>Batson</u> line of cases rendered the State's peremptory challenges improper. Thompson contends that the State's use of peremptory challenges to exclude two African-American members of the venire were violations of the Fourteenth Amendment and requests that we reverse his conviction and remand for a new trial. The State argues that Thompson waived this issue on appeal and that the peremptory challenges were nonetheless not improperly granted.

While we cannot agree with the State that Thompson waived this issue on appeal, we conclude that the trial court did not err when it granted the State's peremptory challenges as

14

to the two African-American members of the venire. This court's decision in Killebrew is instructive, where we applied the Supreme Court's decision in Snyder v. Louisiana, 552 U.S. 472 (2008), and ordered a new trial. In Killebrew, the State used peremptory challenges to strike all five African-American members of the venire. Killebrew, 925 N.E.2d at 400-401. On appeal, another panel of this court compared the answers given by non-white members of the venire who were stricken from the jury to those of white members of the venire whom the State did not strike. Based upon these comparisons with regard to one of the venirepersons, the Killebrew panel concluded that the trial court erroneously permitted the State to exercise a peremptory challenge in violation of the Fourteenth Amendment, reversed Killebrew's convictions, and remanded the case for a new trial. Id. at 402-403.

The result in Killebrew depended upon changes announced by the Supreme Court's opinion in Snyder. The Snyder Court looked at the prosecutor's use of peremptory challenges to strike five African Americans from the venire, giving close scrutiny to the state's race-neutral reasons for striking potential jurors when those explanations applied equally—if not more urgently—to white jurors whom the state did not seek to strike from the panel. The Court looked not only at the conduct of voir dire itself, but also at the course of the trial as a whole when it reversed Snyder's conviction. Snyder, 552 U.S. at 477-86.

Here, the trial court requested sua sponte that the State explain its peremptory challenges as to the two African-American venirepersons. The State pointed to both individuals' statements that they wanted to be presented with scientific evidence connecting Rush to the drugs at issue in the case or other evidence of actual possession. When the trial

15

court observed that other members of the venire had also expressed that wish, the deputy prosecutor further noted that a brother of one of the two potential jurors was a police officer with whom the deputy prosecutor had worked in the past and indicated that she had a bad relationship with him. The deputy prosecutor was therefore concerned that the potential juror might be biased against her. After listening to the State's race-neutral explanations and the defendants' responses, and observing that the State's reasons were of special concern because we had recently reversed the trial court's rejection of a Batson challenge in another case, the trial court granted the State's peremptory strikes. On appeal, Thompson contends that the State's race-neutral rationale was pretextual and that the trial court's determination to the contrary was in error.

With an eye toward the record as a whole, as in Killebrew and Snyder, we cannot agree. As to the juror with whose brother the prosecutor had prior dealings, Thompson does not point to any disparate treatment of similarly-situated non-blacks on the jury—indeed, our review of the record reveals that several individuals whose close relatives were associated with law enforcement were stricken from the venire. So too were other individuals who, like the other black juror whom the State sought to strike with a peremptory challenge, expressed difficulty with constructive possession, a concept central to the State's case. Moreover, the State sought to strike these venirepersons in the first round of voir dire, and two subsequent rounds of jury selection passed without further event. Finally, the trial court's expressed sensitivity to Batson-related issues and its decision to permit the peremptory strikes after raising those issues sua sponte further weighs against a conclusion that the trial court erred

16

when it granted the State's peremptory challenges over Thompson's objection.

In view of the entirety of the trial record and in light of the issues presented at trial, we cannot conclude that the trial court erred when it permitted the State to use its peremptory challenges to strike two African-American members of the venire.

<u>Sufficiency of the Evidence</u>

Finally, Thompson contends that there was insufficient evidence to support his conviction, arguing specifically that there was insufficient evidence of his constructive possession of the cocaine in 4210 Carrollton to support the conviction.

Our standard of review when a defendant challenges the sufficiency of the evidence is well settled. We consider only the probative evidence and reasonable inferences supporting the verdict. <u>Drane v. State</u>, 867 N.E.2d 144, 146 (Ind. 2007). We do not assess the credibility of witnesses or reweigh evidence. <u>Id.</u> We will affirm the conviction unless "no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." <u>Id.</u> (quoting <u>Jenkins v. State</u>, 726 N.E.2d 268, 270 (Ind. 2000)). "The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict." <u>Id.</u> (quoting <u>Pickens v. State</u>, 751 N.E.2d 331, 334 (Ind. Ct. App. 2001)).

Thompson challenges his conviction for Dealing in Cocaine, as a Class A felony. In order to obtain a conviction, the State was required to prove beyond a reasonable doubt that Thompson knowingly possessed, with intent to deliver, cocaine in an amount greater than three grams. I.C. § 35-48-4-1(a)(2) & (b)(1); App. 16-17.

Thompson contends only that there was insufficient evidence of his constructive

17

possession of the drugs in 4210 Carrollton. Constructive possession occurs when an individual does not have an object on his person but nevertheless "'has direct physical control over the item.'" Massey v. State, 816 N.E.2d 979, 989 (Ind. Ct. App. 2004) (quoting Henderson v. State, 715 N.E.2d 833, 835 (Ind. 1999)). "In order to prove constructive possession, the State must show that the defendant has both (1) the intent to maintain dominion and control and (2) the capability to maintain dominion and control over the contraband." Iddings v. State, 772 N.E.2d 1006, 1015 (Ind. Ct. App. 2002), trans. denied.

Here, Thompson concedes that he had the capability to control the cocaine in 4210 Carrollton, but he argues that there is insufficient evidence of his intent to exercise control. "The State must demonstrate the defendant's knowledge of the presence of the contraband to prove the intent element." Grim v. State, 797 N.E.2d 825, 832 (Ind. Ct. App. 2003). Where the defendant has possession of the premises where contraband is discovered, but that possession is not exclusive, the defendant's knowledge may be inferred from additional circumstances, and must be "able to reduce the controlled substance to his personal possession." Id. "In a manufacturing type [sic] setting, a defendant's presence does not compel a conviction but it does present a prima facie case of possession." Moore v. State, 613 N.E.2d 849, 851 (Ind. Ct. App. 1993). Additional circumstances that Indiana courts have found to support an inference that a defendant had "'knowledge of the nature of the controlled substances and their presence'" include:

> (1) incriminating statements made by the defendant, (2) attempted flight or furtive gestures, (3) location of substances like drugs in settings that suggest manufacturing, (4) proximity of the contraband to the defendant, (5) location

18

of the contraband within the defendant's plain view, and (6) the mingling of the contraband with other items owned by the defendant.

Gee v. State, 810 N.E.2d 338, 341 (Ind. 2004) (quoting Lampkins v. State, 682 N.E.2d 1268, 1275 (Ind. 1997), modified on reh'g, 685 N.E.2d 698 (Ind. 1997)).

Thompson concedes that the evidence establishes that he was present in 4210 Carrollton. As to his knowledge of the presence of the drugs and his ability to reduce those drugs to his possession, testimony and photographs established that the first floor of the house was relatively small, with three rooms arranged in a straight line from front to back. The middle room had a couch, chair, and television. In the rear room was a kitchen with a serving window facing the middle room. The middle room on the first floor of the small residence had a shotgun leaning against the wall near the kitchen, and a .38 revolver tucked into the couch with the grip of the pistol protruding from underneath a cushion. In the kitchen, cooking implements with drug residue on them, powder and crack cocaine in various amounts, and baking soda, which cocaine dealers often use to dilute pure or nearly pure cocaine for manufacture and sale, were all in plain view. So too were used surgical gloves, a Walgreens bag, and a box of Walgreens brand surgical gloves. Antonio had purchased gloves from a Walgreens store that day.

Detectives testified that they observed Thompson drive to and enter 4210 Carrollton on two separate occasions that day. Thompson was alone at the residence when Antwan and Antonio left and were apprehended by police at a traffic stop. Drugs were processed and packaged for consumption in the kitchen; both powder and crack cocaine were in plain view

19

in the kitchen.  Cf. Gee, 810 N.E.2d at 341 (listing among factors establishing intent to exercise control over contraband the item's presence in plain view).

Detective Scott testified that he observed an individual whom he later recognized as Thompson look through the blinds at him, and that Thompson opened the blinds with a hand that was wearing a surgical glove like those discovered in the kitchen of the residence. Detectives Deddish and Terry testified that they observed upwards of thirty individuals briefly visit 4210 Carrollton, a pattern of conduct that officers testified was indicative of a location where occupants were selling drugs.  This evidence permits an inference that Thompson intended to exercise control of the cocaine in 4210 Carrollton.

Thompson acknowledges that he was present in both 4210 Carrollton and 4212 Carrollton, and also acknowledges that he used the attic to travel between the two. Detective Gregory testified that his first direct contact with Thompson came when Thompson peeked around a corner soon after Detective Gregory entered 4212 Carrollton.  When Detective Gregory spoke with Thompson in 4212 Carrollton, Thompson provided false identification information.  Unlike the first individual who stepped outside of 4212 Carrollton to smoke a cigarette, when Thompson attempted to leave the house he had no apparent plans to remain outside temporarily, despite Detective Gregory's request that the house's occupants remain inside for their safety.  Taken together, this evidence permits an inference that Thompson used the connection between 4210 Carrollton and 4212 Carrollton to attempt to avoid police—that is, Thompson attempted to evade or flee the detectives multiple times on March 8, 2010.  Cf. Gee, 810 N.E.2d at 341 (including as evidence of intent to exercise control over

20

contraband a defendant's attempted flight from law enforcement).

In light of this evidence, we cannot conclude that there was insufficient evidence from which the jury could infer that Thompson intended to exercise control over the cocaine in 4210 Carrollton.

## Conclusion

The trial court did not abuse its discretion when it denied Thompson's motion to dismiss the charges against him. There was no error in the trial court's denial of Thompson's motion for mistrial after it denied Thompson's <u>Batson</u> challenges. Finally, there was sufficient evidence of Thompson's intent to exercise control over the cocaine in 4210 Carrollton to sustain his conviction for Dealing in Cocaine.

Affirmed.

BAKER, J., and DARDEN, J., concur.