## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 21 2020, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jackie Leigh Butler
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Antwan Rush,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Respondent,* | April 21, 2020<br><br>Court of Appeals Case No.<br>19A-PC-1477<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Alicia A. Gooden, Judge<br><br>The Honorable Richard E. Hagenmaier, Commissioner<br><br>Trial Court Cause No.<br>49G21-1003-PC-23463 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Antwan Rush was convicted of one count of dealing in cocaine as a Class A felony, among other crimes. He received an aggregate sentence of thirty-five years to be served in the Indiana Department of Correction. On direct appeal, we affirmed Rush's convictions. *Rush v. State*, 2012 WL 642064 (Ind. Ct. App. Feb. 28, 2012), *trans. denied*. Rush subsequently filed a petition for post-conviction relief ("PCR") which was denied by the post-conviction court. Rush challenges the denial of his petition, raising two issues for our review: 1) whether he received ineffective assistance from his trial counsel and 2) whether the proffered testimony of a witness at the post-conviction hearing constituted newly discovered evidence. Concluding Rush's trial counsel rendered effective assistance and Rush did not prove the existence of newly discovered evidence, we affirm.

# Facts and Procedural History

[2] In the early morning hours of March 8, 2010, Rush was driving a Trailblazer when Officer Travis Hunter of the Indianapolis Metropolitan Police Department ("IMPD") observed that the vehicle had a cracked taillight. Officer Hunter initiated a traffic stop and learned that Rush's driving privileges had been suspended. Rush's cousin, Ronyai, came to the scene to take possession of the vehicle but IMPD policy precluded officers from releasing the Trailblazer to Ronyai. Rush was arrested and taken to the Marion County Jail, an inventory

search of the Trailblazer was conducted, and the vehicle was towed from the scene to an impound yard.

[3] Around this time, Detective Matthew Stevenson of the IMPD Violent Crimes Unit ("VCU") was seeking to contact Rush in an unrelated matter. On the morning of March 8, he learned that Rush had been arrested, but Rush was released from jail before Detective Stevenson could contact him. Detective Stevenson then discovered several Indianapolis addresses connected to Rush. Among those was a unit in a duplex on North Carrollton Avenue ("4210 Carrollton"). Bureau of Motor Vehicles' ("BMV") records revealed that 4210 Carrollton was Rush's last known address. Detective Stevenson then requested this address be placed under surveillance.

[4] During the afternoon of March 8, detectives observed a Chevrolet Malibu drive from 4210 Carrollton to a nearby Walgreens store. Rush's brother, Antonio, exited the car, entered the store, purchased a box of latex surgical gloves, and got back in the car. The Malibu then returned to 4210 Carrollton. After the Malibu returned from Walgreens, Rush emerged from 4210 Carrollton and stood next to the car for several minutes before returning to the house. Detectives also saw Ronyai twice drive to 4210 Carrollton in a black Dodge Charger. There was very heavy foot and vehicular traffic to and from 4210 Carrollton that was uncharacteristic of the neighborhood – by one detective's estimate, nearly thirty-five people came and went while the house was under surveillance – with each person remaining at the residence for only a few minutes before leaving. Detectives recognized this conduct as characteristic of

individuals purchasing drugs. Detectives later learned that Brigitte Winters was among those who went to 4210 Carrollton on March 8; she went there to purchase crack.

[5] Late that afternoon, detectives reported that the Malibu left 4210 Carrollton. Detective Stevenson requested that uniformed police officers stop the car, and he and several other detectives traveled to the scene of the traffic stop. When police stopped the vehicle, they found Antonio driving with Rush in the passenger's seat. Each was in possession of large sums of cash. While the traffic stop was under way, other VCU detectives approached 4210 Carrollton and knocked on the front door. After receiving no reply, detectives knocked louder. They heard loud noises coming from inside the house. Shortly after this, Ronyai opened a space in the blinds to see who was at the door. After Ronyai saw detectives, he snapped the blinds closed. The detectives continued to hear noise from inside the house, including Ronyai's voice, but no one came to the door. Winters was still in the house when police knocked but she hid upstairs because there was no way for her to get out of the house without being spotted by police.

[6] On direct appeal, the court described what occurred next:

> Knowing that older duplexes like the one at 4210 Carrollton often allowed attic access to the adjacent unit in the building, Detective Gregory knocked on the door of the other unit in the duplex, 4212 Carrollton. One of its occupants admitted him to the residence. Detective Gregory explained that police suspected criminal activity in 4210 Carrollton, and obtained identification information from the occupants of 4212 Carrollton. After

advising the occupants to remain inside for their safety, Detective Gregory left 4212 Carrollton. Among those in 4212 Carrollton was Ronyai, who had identified himself to Detective Gregory as Sam Jones and provided a date of birth and social security number.

Detective Gregory ran each of 4212 Carrollton's occupants['] names through police computers and determined that the information Ronyai provided was false. . . . Ronyai, accompanied by a female adult, left the house carrying a child in his arms. Detective Gregory called Ronyai over to ask him about the false identification information he had provided. After handing the child over to his female companion, Ronyai provided correct identification information. Detective Gregory checked the correct information in police computers and determined that Ronyai's driving privileges had been suspended. Because detectives had seen Ronyai driving the black Dodge Charger earlier that day, [they] arrested him.

In the interim, Detective Stevenson sought and obtained [a] search warrant[] for 4210 Carrollton . . . . During their search of 4210 Carrollton, police found drug-related items throughout the first floor of the house, including 281.243 grams of powder cocaine and 90.639 grams of crack cocaine; cooking pans with cocaine residue; numerous rubber gloves and plastic baggies, several of which contained crack cocaine; a twenty-gauge shotgun and shotgun shells; and a loaded .38 Special revolver. Police also found, in the second floor of the house, a panel allowing access into the shared attic between 4210 Carrollton and 4212 Carrollton, which permitted Ronyai to move between the two units in the duplex while avoiding police observation.

*Id*. at *3. At the time police served the search warrant, Winters was still in the house. Officers spoke with Winters. However, they allowed Winters to leave and did not include any information about her in the probable cause affidavit.

[7] The State charged Rush with one count of dealing in cocaine as a Class A felony for the drugs found at 4210 Carrollton, among other crimes related to other times and places.[1] This charge was based on the theory of constructive possession because Rush was not at 4210 Carrollton when the search warrant was executed and the drugs were found. Winters was not listed as a State's witness in the charging information. Ronyai was charged with related offenses and tried alongside Rush.

[8] Shortly before trial, prosecutors on this case changed and the new prosecutor filed the State's final witness list which did not include Winters as a potential witness. However, the State notified defense counsel that a "confidential informant" had given a taped statement but would not be called as a witness during its case-in-chief. *See* [Direct Appeal] Transcript, Volume IV at 74.[2]

[9] Rush's jury trial ensued. At the conclusion of the State's evidence, the State requested to have Winters testify as a rebuttal witness to counter testimony that

---

[1] The State also charged Rush with one count of conspiracy to commit dealing in cocaine (a second count was dismissed by the State before trial) and a second count of dealing in cocaine, both Class A felonies; two counts of possession of cocaine and possession of cocaine and a firearm, each Class C felonies; unlawful possession of a firearm by a serious violent felon, a Class B felony; and possession of marijuana, a Class A misdemeanor. *See* Appellant's [Direct Appeal] Appendix, Volume I at 36-37.

[2] Our citation to the direct appeal transcript is based on the .pdf pagination.

Ronyai was never in the residence and never had cocaine in his possession. According to the State, Winters would testify that she was at 4210 Carrollton at the time of the search and that Ronyai was inside 4210 Carrollton with her. Ronyai's counsel objected to Winters testifying; Rush's counsel did not audibly join the discussion. The trial court ultimately ruled that Winters would not be allowed to testify.

[10] The jury found Rush guilty as charged. The trial court entered judgment of conviction against Rush for convictions including one count of dealing in cocaine at 4210 Carrollton.[3] The trial court sentenced Rush to thirty-five years. A panel of this court affirmed Rush's convictions on direct appeal. *Rush*, 2012 WL 642064 at *9.

[11] In 2012, Rush filed a pro se petition for PCR alleging, inter alia, that his trial counsel was ineffective. His petition was amended by counsel in 2017 to raise the following issues relevant to this appeal: his trial counsel was ineffective for failing to investigate and speak to Winters, who arguably had exculpatory evidence, and the testimony of his co-defendant, Ronyai, was newly discovered evidence. *See* Appellant's [Post-Conviction Relief] Appendix, Volume I at 47.

[12] At the PCR hearing, the court heard testimony from Winters, Rush's trial counsel, and Ronyai. Winters testified that she was familiar with Rush because

---

[3] The trial court also entered judgments of conviction for one count of dealing in cocaine and one count of possession of marijuana related to drugs found during a search of the Trailblazer.

she used to get crack from him in 2009. On March 8, 2010, Winters had gone to 4210 Carrollton to "get . . . a sack of crack[.]" [Post-Conviction Relief] Transcript ("PCR Tr.") at 4. When she arrived at 4210 Carrollton, Rush opened the door and Winters noticed that the house, including the kitchen counter, was cleaner than usual. Rush then gave Winters a sack of crack. When asked if she was sure that it was Rush who sold the crack to her or if there were other people that sold to her from that address, Winters said, "Just him and I." *Id.* at 7. Shortly thereafter, police arrived at 4210 Carrollton; Rush had already left. The police knocked on the door. Winters tried to find a way to get out the house but was unable to, so she ran upstairs and hid. At some point, Winters came back downstairs but this time she noticed two bags of cocaine on the kitchen counter that were not there when she had entered. Later in her testimony, Winters stated that she was not positive that Rush had sold her the crack because she kept "getting [Rush and Ronyai] mixed up[.]" *Id.* at 22. However, Winters said that she obtained crack from Rush on most occasions.

[13]     Rush's trial counsel, Jeffery Mendes, testified that he could not remember if he had ever spoken with Winters. However, Mendes could not locate his file regarding Rush's case and was testifying from memory about an eight to nine-year-old case. Nonetheless, Mendes stated, "I don't know why I didn't speak to her, unless her name was never given to me or presented to me as a person that needed to be spoken to, but I don't think any of the . . . lawyers spoke to her." *Id.* at 31.

[14] Ronyai testified that he did not see Rush at 4210 Carrollton on March 8, that Rush was not in the house when Winters arrived, and that Rush did not sell Winters crack that day. *See id*. at 44. Ronyai confirmed that he was in the house when police came, the cocaine on the counter belonged to him, and he sold drugs to Winters at 4210 Carrollton.[4]

[15] The post-conviction court issued findings of fact and conclusions thereon denying Rush's amended petition. The post-conviction court concluded:

> [T]here was other evidence that linked [Rush] with the house. It could very well have been a strategy not to pursue discovery of a witness who could likely be harmful to the defense. By discovering [Winters] and interviewing her the defense could very well have increased the likelihood of her being a witness, since the State could argue that the defense was then given discovery prior to trial, thus lessening the argument of surprise. Regardless, the Court does find that [Rush] has not proven ineffectiveness given all of the circumstances.

> Additionally, [Rush] fails to show how this evidence would have resulted in a different outcome. The allegation is that [Winters'] testimony would help show [Rush] was not there that day. Any minimal relevance such testimony might have had is certainly outweighed by the credibility issues surrounding [Winters] and her potential for harmful testimony.

---

[4] Ronyai asked Rush's counsel to cancel the transport order for his appearance at Rush's PCR hearing because he was "currently pursuing [his] own legal endeavors" and offered to instead write a statement on Rush's behalf. *See* [Post-Conviction Relief] Exhibits, Volume II at 11. When he was nonetheless transported to court, he decided to testify because Rush is "taking a bullet that he don't deserve and that's something that tears me up at night and he shouldn't . . . be here. He shouldn't be going through this." PCR Tr. at 47.

\* \* \*

> [Ronyai] did not come forward to testify until after his appeal was lost and his [PCR] denied. He had nothing to lose by testifying at the hearing. Such testimony is inherently suspect. . . . Such testimony is not "newly discovered" evidence and should be given no weight in this case. And assuming it is considered, [Ronyai's] testimony was not "worthy of credit."

Appealed Order at 5-6, 8. Rush now appeals.

# Discussion and Decision

## I. Post-Conviction Relief Standard of Review

[16] Post-conviction proceedings are civil in nature and the petitioner must therefore establish his claims by a preponderance of the evidence. Ind. Post-Conviction Rule 1(5). "Post-conviction proceedings do not afford the petitioner an opportunity for a super appeal, but rather, provide the opportunity to raise issues that were unknown or unavailable at the time of the original trial or the direct appeal." *Turner v. State*, 974 N.E.2d 575, 581 (Ind. Ct. App. 2012), *trans. denied*. To prevail on appeal, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Hall v. State*, 849 N.E.2d 466, 469 (Ind. 2006). This court will not reweigh the evidence or reassess the credibility of the witnesses and we consider only the evidence and reasonable inferences supporting the judgment. *Id*. at 468-69. We do not defer to the post-conviction court's legal conclusions but do accept its factual findings unless they are clearly erroneous.

*Stevens v. State*, 770 N.E.2d 739, 746 (Ind. 2002), *cert. denied*, 540 U.S. 830 (2003).

## II. Ineffective Assistance of Trial Counsel

Rush first contends the post-conviction court erred in denying his petition for PCR on his claim that he received ineffective assistance of trial counsel. We review claims of ineffective assistance of trial counsel under the two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). *Kubsch v. State*, 934 N.E.2d 1138, 1147 (Ind. 2010). To prevail on a claim of ineffective assistance of counsel, the petitioner must show his trial counsel's performance was deficient and counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687. To satisfy the first prong, the petitioner must show counsel's representation fell below an objective standard of reasonableness and counsel committed errors so serious petitioner did not have "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *Garrett v. State*, 992 N.E.2d 710, 718-19 (Ind. 2013). To satisfy the second prong, the petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id*. at 719. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. These two prongs are separate and independent inquires. *Manzano v. State*, 12 N.E.3d 321, 326 (Ind. Ct. App. 2014), *trans. denied*, *cert denied*, 135 S.Ct 2376 (2015). Therefore, "if it is easier to dispose of an ineffectiveness claim on one of the grounds instead of the other, that course should be followed." *Talley v. State*, 736 N.E.2d 766, 769 (Ind. Ct. App. 2000).

[18] We recognize a strong presumption counsel rendered adequate legal assistance and afford trial counsel "considerable discretion in choosing strategy and tactics, and we will accord those decisions deference." *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001), *cert denied*, 537 U.S. 839 (2002). In order to overcome this strong presumption, a petitioner must offer "strong and convincing evidence" to the contrary. *Smith v. State*, 822 N.E.2d 193, 202 (Ind. Ct. App. 2005), *trans. denied*.

[19] Rush contends that Mendes was ineffective for allegedly failing to adequately investigate a potentially exculpatory witness – Brigitte Winters – whose testimony he believes would have likely acquitted him of dealing in cocaine at 4210 Carrollton.[5] When deciding a claim of ineffective assistance for failure to investigate, we apply a great deal of deference to counsel's judgments. *Boesch v. State*, 778 N.E.2d 1276, 1283 (Ind. 2002). Establishing failure to investigate as a ground for ineffective assistance of counsel requires going beyond the trial record to show what an investigation, if undertaken, would have produced. *McKnight v. State*, 1 N.E.3d 193, 201 (Ind. Ct. App. 2013). "This is necessary because success on the prejudice prong of an ineffectiveness claim requires a showing of a reasonable probability affecting the result." *Id*. (citation omitted).

---

[5] Although Rush's prayer for relief in this appeal is that "his convictions and sentences" be vacated, Brief of Appellant at 35, other than two peripheral mentions of the Trailblazer, he has not argued that Winters' or Ronyai's testimony would entitle him to relief on convictions related to drugs found in the vehicle.

[20]     In the instant case, the State agreed that they did not reveal Winters' name until the day of Rush's trial. Before trial, Winters was referred to only as a "confidential informant" by the State when revealing her existence to defense counsel. This would suggest that Rush's trial counsel would not have known to interview Winters because of her status. On the other hand, although the record is unclear whether anyone else knew Winters was in the house when the warrant was served, at least one person (Ronyai, but also from Winters' testimony at the PCR hearing, Rush) knew she was at the house earlier and she was a regular purchaser. Thus, Rush could have had some idea of who the "confidential informant" was to inform his trial counsel to investigate Winters. But regardless of the question of deficient performance, Rush has not shown how he was prejudiced by his trial counsel's performance. *See Young v. State*, 746 N.E.2d 920, 927 (Ind. 2001) (explaining that it was not necessary to address the allegations of deficient performance where the petitioner had failed to establish prejudice and affirming the trial court's denial of PCR); *Strickland*, 466 U.S. at 697 (explaining that "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed").

[21]     Rush cannot prove that he was prejudiced because Winters was not an exculpatory witness as he claims. Notwithstanding that the State represented at trial that Winters would testify she purchased cocaine from Ronyai, Winters testified at the post-conviction hearing that she knew Rush because he previously sold crack to her and that she had gone to 4210 Carrollton on March

8, 2010 mainly to purchase crack from Rush. It is true that Winters became confused about who actually sold her crack on March 8 as her testimony continued, but she averred that she dealt with Rush on most occasions. *See* PCR Tr. at 23. Nonetheless, Winters' testimony would have established a clear nexus between Rush and drugs being sold out of 4210 Carrollton, which would have been evidence unfavorable to Rush. Rush's claim that Winters' testimony is credible only to implicate Ronyai as the sole person at 4210 Carrollton on March 8 who was responsible for the drugs is an invitation for us to reassess the credibility of the witnesses – an invitation that we cannot accept. *See Hall*, 849 N.E.2d at 469.

[22] Moreover, even if Winters had testified at trial that Ronyai sold her the drugs and was the only person in the house with her on March 8 when the drugs were found, the remaining evidence does not support a reasonable probability that the result would have been different – that is, that Rush would have been acquitted of dealing in cocaine from 4210 Carrollton. Rush has some possessory interest in 4210 Carrollton. BMV records show 4210 Carrollton as Rush's last known address. While detectives surveilled the house, they noticed Rush emerge from the house and return to it several times. During this same time, they observed conduct characteristic of people purchasing drugs from that location. When detectives conducted a traffic stop after Rush left the house in a vehicle, they found Rush in possession of large amounts of cash. When detectives later executed a search warrant on 4210 Carrollton, they discovered a large quantity of drugs, paraphernalia, and weapons. In light of this evidence, a

reasonable factfinder could conclude that the evidence was sufficient to support Rush's convictions even if Winters had testified at trial as she did at the PCR hearing.

[23] In the circumstances surrounding this case, Rush has failed to show prejudice, that is, that Winters' testimony would have resulted in a different outcome. Therefore, he has failed to meet his burden of proving by a preponderance of the evidence that his trial counsel was ineffective. Thus, the post-conviction court did not err in denying him relief on this issue.[6]

# III. Newly Discovered Evidence

[24] Rush next argues that the post-conviction court erred in determining that Ronyai's testimony did not constitute newly discovered evidence. We disagree.

[25] In Indiana, new evidence will mandate a new trial only when the petitioner demonstrates 1) the evidence has been discovered since the trial, 2) it is material and relevant, 3) it is not cumulative, 4) it is not merely impeaching, 5) it is not privileged or incompetent, 6) due diligence was used to discover it in time for trial, 7) the evidence is worthy of credit, 8) it can be produced upon a retrial of the case, and 9) it will probably produce a different result at retrial. *Carter v. State*, 738 N.E.2d 665, 671 (Ind. 2000). We "analyze[] these nine factors with

---

[6] Rush alternatively argued in his petition for relief that Winters' testimony was newly discovered evidence, but he failed to present that as a separate issue on appeal and therefore, we need not discuss whether Winters' testimony constituted newly discovered evidence.

care, as the basis for newly discovered evidence should be received with great caution and the alleged new evidence carefully scrutinized." *Taylor v. State*, 840 N.E.2d 324, 330 (Ind. 2006) (quotation omitted). "The burden of showing that *all* nine requirements are met rests with the petitioner for post-conviction relief." *Id.* (emphasis added).

[26] The post-conviction court determined that Rush failed to prove at least one of the nine requirements: that Ronyai's testimony was worthy of credit. The nine factors enumerated in *Carter* for newly discovered evidence are written in the conjunctive and therefore, if Rush failed to prove any one requirement, his claim fails. Whether a witness's testimony at a post-conviction hearing is worthy of credit is a factual determination to be made by the post-conviction court which has the opportunity to see and hear the witness testify. *McVey v. State*, 863 N.E.2d 434, 446 (Ind. Ct. App. 2007), *trans. denied*. It is not within an appellate court's province to replace a post-conviction court's assessment of credibility with its own. *State v. McCraney*, 719 N.E.2d 1187, 1191 (Ind. 1999).

[27] The post-conviction court found that Ronyai's testimony was "inherently suspect" because he had nothing to lose by testifying at the hearing. Appealed Order at 8. Ronyai, who understandably did not testify at trial, testified at the PCR hearing that he did not see Rush at 4210 Carrollton on March 8 and that the drugs found there were his. He also testified Rush was not involved with drugs. Ronyai only testified at the PCR hearing after being notified of Rush's extensive sentence; Ronyai did not believe Rush (his cousin) deserved to be incarcerated. Ronyai has nothing to lose by claiming he alone sold drugs from

4210 Carrollton because he is currently serving an executed sentence, his direct appeal was unsuccessful, and the denial of his PCR petition is final.[7]

[28]     This case is similar to *Birkla v. State*, 272 Ind. 117, 396 N.E.2d 115 (1979). Birkla and his co-defendant were charged with murder. Birkla was granted a separate trial and was tried before his co-defendant. Birkla's co-defendant did not testify at his trial. After Birkla was convicted of murder and sentenced to life imprisonment, his co-defendant pleaded guilty to voluntary manslaughter. Birkla filed a petition for PCR alleging that newly discovered evidence from his co-defendant existed. At the post-conviction hearing, Birkla's co-defendant testified that he was the sole perpetrator and that Birkla was not involved in the crime. The post-conviction court denied his petition and concluded,

> [Co-defendant] was tried after [Birkla], did not testify at the original trial of [Birkla] and was allowed to plead guilty to voluntary manslaughter. A witness under these circumstances has very little, if anything, to lose by now admitting complete responsibility for the crimes with which he and [Birkla] were charged, making it in my opinion not worthy of credit and therefore not likely to produce a different result in the trial of [Birkla].

---

[7] Ronyai was charged with crimes similar to Rush. Ronyai was tried alongside Rush and was also found guilty of several charges, including dealing in cocaine at 4210 Carrollton. Ronyai's conviction for dealing in cocaine was affirmed on direct appeal. *See Thompson v. State*, 966 N.E.2d 112, 124 (Ind. Ct. App. 2012), *trans. denied*. Ronyai filed a petition for PCR, but his petition was denied on May 13, 2014. *See Thompson v. State*, Cause No. 49G20-1003-PC-23467; *see also* PCR Tr. at 51. He did not appeal the post-conviction decision and the time to seek an appeal has lapsed.

*Id.* at 118, 396 N.E.2d at 116. On appeal, our supreme court affirmed the decision of the post-conviction court. Here, too, Ronyai has exhausted all of his legal remedies and therefore, he has nothing to lose by taking responsibility for the drugs found inside 4210 Carrollton. Given our deferential standard of review, we conclude that the post-conviction court did not err in denying Rush relief on this issue.[8]

# Conclusion

Our review of the post-conviction court's judgment does not leave us with the belief that a mistake has been made: Rush has not shown by a preponderance of evidence that the evidence as a whole leads unerringly and unmistakably to the conclusion that his counsel was ineffective for allegedly failing to investigate Winters or that Ronyai's testimony constituted newly discovered evidence. We therefore affirm the post-conviction court's order denying Rush's petition for post-conviction relief.

Affirmed.

Bradford, C.J., and Altice, J., concur.

---

[8] Rush also argues that the cumulative effect of his trial counsel's alleged failure to investigate Winters and Ronyai's admission entitles him to relief. Specifically, he contends that "[m]ost cases don't involve two previously-unheard witnesses, one the result of ineffective assistance of counsel and the other the Fifth Amendment rights of a co-defendant." Br. of Appellant at 34. However, as discussed above, we have found no error in either respect and therefore, Rush is not entitled to the relief he seeks.